## Laureldale Cemetery Association v. Matthews et al.

*C. A. Wolfe* and *Paul D. Edelman*, for complainant.
*D. H. Muth*, for defendants.

SHANAMAN, J., March 5, 1945.—

*Pleadings and issues*

The pleadings are: (1) Bill in equity by a cemetery association praying for a decree of exemption from taxation, and (2) defendants' answers setting up (*a*) that some of the land is not exemptible for the reason that it is not used for cemetery purposes, and (*b*) that none of plaintiff's land is exemptible for the reason that it is all used or held for private or corporate profit.

The issues are: (1) Whether the nonuse for cemetery purposes of some of plaintiff's land affects its right of exemption and to what extent, and (2) whether or not plaintiff's land is in fact used or held for private or corporate profit.

*Findings of fact*

1. The complainant, Laureldale Cemetery Association, is a corporation of the first class, incorporated under the Act of May 5, 1933, P. L. 289, of the Assembly of the Commonwealth of Pennsylvania known as the "Nonprofit Corporation Law"; its Charter and Certificate of Incorporation having been duly approved by decree of this court dated December 7, 1942.

2. The purposes for which the complainant corporation was organized, as stated in its articles of incorporation, are:

". . . the acquisition, establishment and maintenance of a cemetery in the City of Reading, Pennsylvania, or its environs, the acquisition, establishment and maintenance of private mausoleums, the acquisition and sale of land or real estate and crypts in connection therewith, and the granting of the right of sepulture in connection therewith, the acquisition and sale or other disposal of patent or patent rights incidental to or related with mausoleums. The corporation does not contemplate pecuniary gain or profit, incidental or otherwise, to its members."

3. On December 30, 1942, complainant acquired from Laureldale Cemetery Company, a business corporation heretofore duly organized and existing under the laws of the Commonwealth of Pennsylvania, title in fee simple to certain premises known as Laureldale Cemetery, located in Muhlenberg Township, Berks County, Pa., and fully described in the deed therefor offered in evidence at the trial as plaintiff's exhibit no. 3.

4. The officers and directors of Laureldale Cemetery Association are the same persons who were the officers and directors of the Laureldale Cemetery Company, predecessor in title to the Laureldale Cemetery Association. . . .

6. The entire property consists of three purparts of real estate, being no. 1, 98.82 acres, described in finding of fact no. 5; no. 2, 15.77 acres, and no. 3, 10.3 acres. The two smaller tracts are not contended to be tax-exempt.

7. In addition to the real estate above referred to, the complainant also acquired from said Laureldale Cemetery Company on December 30, 1942, by bill of sale offered in evidence at the trial as plaintiff's exhibit no. 4, all the other property and assets, buildings, equipment, fixtures, accounts receivable and cash of said Laureldale Cemetery Company, subject to its liabilities as set forth in the document entitled "assumption of liabilities" offered in evidence at the trial as plaintiff's exhibit no. 5.

8. In consideration of the said transfer by Laureldale Cemetery Company to the complainant of its property and assets, real, personal and mixed, the complainant, on December 30, 1942, created an issue of its bonds designated as "Purchase Money First Mortgage 4% Non-Cumulative Income Bonds", in the aggregate principal amount of $113,375, and secured by a mortgage of the said premises known as Laureldale Cemetery to

Berks County Trust Company as Trustee, under date of December 30, 1942.

9. The said income bonds of the complainant were thereupon distributed pro rata among the stockholders of said Laureldale Cemetery Company. The cemetery company was dissolved and its stock canceled.

10. The bondholders of the Laureldale Cemetery Association are the same persons who were the shareholders of the Laureldale Cemetery Company.

11. The Laureldale Cemetery Association acquired real estate from the Laureldale Cemetery Company of a value of $200,000 and stipulated by the parties in court, through their counsel, to have been worth, together with the personal property conveyed, at least $113,375, the face amount of the bonds issued under the mortgage.

12. For the year 1943 the County of Berks assessed plaintiff's real estate, as a whole, at $40,000. For the year 1944, the three parcels were assessed separately for county, township, school district, road board and institution district taxes as follows: Tract no. 1, of 98.82 acres, at $38,000; tract no. 2, of 15.77 acres, not here involved, at $1,500, and tract no. 3, of 10.3 acres, not here involved, at $500.

13. The mortgage bonds held by the former shareholders provide for the payment of interest at not more than four percent noncumulative.

14. Under the provisions of said mortgage no interest is due or payable upon said bonds except out of any balance which may remain after deducting from complainant's gross revenues from all sources for any six months' period, all expenses, maintenance, repairs, reserves and all other charges incurred or accrued; and to the extent that any such balance may not suffice to pay any such semi-annual instalment of interest, the complainant is not obligated to pay the same thereafter, except that interest for a specific six months may

under certain conditions be carried over into one next ensuing period of six months.

15. No interest has been paid by complainant on any of said bonds at any time since the same were issued.

16. The Laureldale Cemetery Company from its organization in 1923 until the end of 1942, paid at various times dividends to its shareholders, totaling 84 percent of the $100 par value of the stock.

17. The cemetery is located entirely on tract no. 1, containing 98.82 acres; the whole of this tract is intended for cemetery purposes, but only two-thirds of it has been actually laid out into lots and improved on the ground. The developed two-thirds comprise both sold and unsold lots.

18. The complainant so using and occupying the said premises is seized of the legal or equitable title in the said realty and is the possessor of the personal property absolutely.

19. Tract no. 1, consisting of 98.82 acres, is necessary for cemetery purposes and is actually used, held and occupied by plaintiff for cemetery purposes.

20. On or about April 20, 1943, complainant duly filed an application for exemption from taxation of the aforesaid premises, but the said application was denied by the County Commissioners of Berks County.

21. The plaintiff pays its president $2,400 a year, its superintendent, $2,600 a year, and its secretary, $1,430 a year.

22. In 1943 plaintiff association had a gross income of $20,742.90; against this sum plaintiff on its records charged approximately $19,000 for cemetery expenses.

### Discussion

At the time the bill was filed, June 18, 1943, plaintiff's property was assessed in one parcel for the 1943 tax. Since it has been admitted that the smaller tracts, nos. 2 and 3, are taxable, plaintiff's appropriate remedy was an appeal from the assessment (Dougherty v. City

of Philadelphia et al., 112 Pa. Superior Ct. 570), and in such case a bill in equity to restrain collection must be dismissed. However, on February 11, 1944, the assessment was changed to a separate assessment for each of the three tracts for the year 1944. At the trial the parties at bar stated for the record that the smaller tracts have since been separately assessed and that paragraph three of the bill should be amended so as to describe as the land in controversy only tract no. 1 of 98.82 acres. Inasmuch as the controversy extends not only to the tax for the year 1943, but also to that of future years while the conditions as to exemptibility remain unchanged, the court, in order not to impose on the parties the burden of further litigation, will adjudicate the matter in issue.

The unimproved part contains unimproved roads and is in grass, kept mown and cared for. This unimproved one-third, or more exactly, 30 acres, of the total 98.82 acres, does not appear to us to be exceptional or unusually large. Charles Evans Cemetery, situate in the City of Reading, Pa., is 98 years old, with an acreage of 120 acres. Of its area 15 to 20 acres remain undeveloped, even to this late day. Since the opening of Charles Evans Cemetery the City of Reading has grown from a small town to a considerable city. The developed two thirds of plaintiff's cemetery contain about 5,300 lots of which 3,871 have been sold. The remaining 1,519 unsold lots, at an annual rate of 175 sales, will be disposed of within the next nine years, and long before the end of such period, the further improvement and laying out of the remaining 30 acres will doubtless have become advisable. Since the entire tract is intended to be used for human sepulture, and since we hold that the unimproved part is not excessive, the tract is exempt from taxation if it has been shown to be not held for private profit. "The following property shall be exempt from . . . tax, to wit: . . . (b) All burial grounds and all mausoleums, vaults, crypts

or structures intended to hold or contain the bodies of the dead, not used or held for private or corporate profit", provided that it is in actual use and occupation for the purposes specified: The General County Assessment Law of May 22, 1933, P. L. 853, art. II, sec. 204, as amended May 3, 1943, P. L. 158, sec. 1, 72 PS §5020-204.

It is obviously not necessary for exemption from tax that the property be completely occupied with graves and its capacity for further interment exhausted. A reasonable provision for the deaths to come does not prevent the exemption of the total acreage provided that the area as yet unused is intended and held for burial purposes, and is not excessive in view of all the circumstances. In Pomfret Manor Cemetery Co. v. City of Sunbury, 4 D. & C. 147, the court took into consideration among other things, "the reasonable requirements of the future", p. 151. In Green Mount Cemetery Company's Appeal, 7 D. & C. 200, a cemetery company was held exempt, which consisted of 6¾ acres nearly filled with graves, and 10 adjacent acres practically vacant, of which a part was cleared and put in condition for cemetery plotting, and in which 50 lots had been sold. In Mountain View Cemetery Co. v. Massey, 109 W. Va. 473, 155 S. E. 547, the cemetery consisted of 15 acres, of which three acres were developed, and contained 60 burials. The remaining 12 acres were held in reserve. The court held that in a city of 60,000 population, the reserve was not excessive, and said (p. 478):

"The space required for burial purposes constantly increases, and a reasonable quantity of land for future occupancy should be provided. Of course, the setting aside of any acreage for cemeterial purposes, whether commercial or eleemosynary, must be predicated on good faith, and the acreage set aside or reserved for future use must not be disproportionate in extent to the population of the community to be served and a

reasonable expectation of the service to be rendered." id. 477.

The case of The People ex rel. Huck v. The Graceland Cemetery Company, 86 Ill. 336, is distinguishable. There the company was held liable to taxation upon two tracts of about 154 acres, separated by a public highway from its cemetery proper, which contained 96 to 100 acres. It appeared that the company had ample contiguous lands for the extension of its interments, without going upon the 154 acres. It did not appear that the cemetery had even a remote intention or likelihood of burying on the 154 acres. In Evergreen Memorial Park Assn. v. Evatt et al., 141 Ohio 1, 46 N. E. 2d 286, the cemetery contained 24½ acres, of which 4.4 acres were in actual use as a burial ground. The entire tract was ruled exempt. Pomona Cemetery Assn. v. Board of Supervisors of Los Angeles County et al., 122 Pac. 2d 327, Calif., and Metairie Cemetery Assn. v. Board of Assessors, 37 La. Ann. 32, accord.

Defendants' remaining contention is that the cemetery is not operated exclusively for nonprivate or noncorporate profit. In deciding this question the burden of proof is an important factor. It is on the taxpayer. The facts adduced by him may raise a doubt in the minds of the tax authority or of the court, but unless that doubt is conclusively resolved in favor of the claim to exemption by evidence clearly demonstrating the absence of any element of private profit, the exemption must be denied. "A claimant for exemption must bring himself clearly within the exempting statute." Wynnefield United Presbyterian Church v. City of Philadelphia et al., 348 Pa. 252, 255, "Since the question is one of an exemption from a tax, the defendant had the burden of proving his release": Commonwealth v. Clark, 344 Pa. 155, 157. " 'The claimant of exemption from taxation must show affirmative legislation in support of his claim, and his case must be clearly within it' ": Y. M. C. A. of Germantown v. Philadelphia, 323 Pa.

401, 408. The facts in the case are not disputed. In 1923 The Laureldale Cemetery Company was organized to operate a cemetery on what was originally known as the Sullivan farm. The operators of the cemetery found it expedient to confine the actual burying to tract no. 1, the 98.82 acres in question. The cemetery was laid out by a Philadelphia landscape architect. The stock of the company had a par of $100, totaling $100,000, of which $92,000 was issued and outstanding in December 1942. The stockholders were originally about 35 in number, and took amounts varying from $3,500 to $5,000. The corporation was organized for profit, paid dividends and its stock was quoted on the local stock exchange. In December 1942, after about twenty years of operation, the company had had about two hundred thousand dollars spent on it, and had a "low" value of $200,000. Its stock had a book value of $175 a share, and the company had also declared and paid cash dividends which amounted in all to 84 percent of the par value of the stock.

The record does not show how many lots had been sold up to December 1942, and what proportion these bore to the total area available for interment. However, it appears that up to the present time the two smaller tracts, of which one is available for burial, had not been developed; about 30 acres or 30 percent of tract no. 1 remains undeveloped; and of the developed portion of tract no. 1, consisting of 5,390 lots, 3,871 had been sold, and 1,519 or 28 percent remain unsold. In the latter part of 1942, the 35 stockholders reorganized in the following way. They organized a new corporation which was named "Laureldale Cemetery Association". By its charter it was declared to be nonprofitable and without capital shares. The officers and directors were the same as those of the old company. The "company" conveyed all its assets to the "association", in return for which the "association" issued to each stockholder four percent interest-bearing bonds

of the "association" on the basis of $125 of bonds for each $100 par value of stock of the "company". The extra $25 of bonds issued for each share represented the increase, through the company's operations, of the value of the stock over par. The bonds were secured by a mortgage, dated December 30, 1942, given by the "association" to a trustee in trust as a security for the holders of the bonds. The mortgage is in general the usual type of corporate trust security. Articles 1 and 2 describe the bonds. Article 3 limits the "enforcible" payment of interest to "available net income" and defines such income. The voluntary payment is limited to four percent and it is provided that if interest is not fully earned, that is up to four percent in any six-month period, only the amount actually earned, as defined, shall be due, except that the interest may be accumulated for the next six months under certain conditions. Articles 3 and 4 provide for the redemption of all bonds; article 5 for a sinking fund for bond redemption, and article 6 for the sale by the association, while it is not in default, of rights of sepulture, free of lien. In case of default of payment, of interest or principal, the trustee is given, in article 8, the usual rights of entry, operation, sale of assets as a whole or by parcels, foreclosure, and recovery of judgment. The principal of the bonds may be declared to be due and payable as a whole upon any default, and shall upon any default, upon the written request of 25 percent of the bondholders, be so declared. The maturity date of the bonds is January 1, 1973.

The 35 former stockholders, now bondholders, chose in their new organization to have only the officers and directors of the old corporation, who became also those of the new, to constitute the membership of the new corporation. Instead of their former right as stockholders to control the corporation, they were content to rely on the provisions of the trust mortgage and bond for the security of their investment, and upon the man-

agement of the continuous body of officers and directors. The stockholders admittedly operated for profit while a "company", and enjoyed the receipt of considerable profits from 1923 to 1942. When in 1942 they reorganized as the "association", they did not waive all monetary benefits although they did abolish the stock and substitute a mortgage and bonds. They organized the new form of their corporation in such a way that they should have returned to them their original contribution of capital and an additional 25 percent thereof, with additional interest not to exceed four percent. It will be observed that this interest is actually an amount approximate to that which the business had paid in dividends from the time of its organization to the reorganization (86 percent in 19-20 years). The taxing authorities do not contend that there is anything unreasonable or unlawful about the reorganization, since admittedly the value of the assets turned over to the present plaintiff by its predecessor was at least as great as the amount of the bonds issued ($113,375). Nevertheless the taxing authorities' contention that the operation of the association does involve some element of private profit, must be sustained. Without any question as to the good faith of the former stockholders and present bondholders, it is not surprising that they have failed to accomplish a task which involves, to the mind of the chancellor, a very difficult legal problem, namely to convert a profitable company, organized for profit, and having a substantial surplus representing undistributed profits, into a company not for profit, within the meaning of the tax exemption law, and at the same time to retain the same financial interests in the same hands, undiminished and unimpaired. A case like the present seems not to have arisen here in Pennsylvania, but has been approached elsewhere, and these decisions we shall later discuss.

In Pennsylvania the Supreme Court in the case of Brown's Heirs v. Pittsburgh, 1 Monaghan 8, 16 A. 43

(1888), decided that where a church bought ground and used it as a burial place, the land was not exempt from taxes under the circumstances of that case. Speaking of the cemetery, the court in a per curiam opinion, said (p. 10):

"It may be true that it is not at present profitable, and may never be so, but as it seems to have been bought as an investment for the church, and, as whatever revenues are derived from it are for the use of the church, and by it may be appropriated to any purpose which to the said church may seem fitting, it is obvious that it is not embraced within the statutory provision above mentioned."

In Ivy Hill Cemetery Company's Appeal, 120 Pa. Superior Ct. 340, the cemetery company was a corporation not for profit, and its usual operations were "such that, as a general proposition, its land used for burial purposes is entitled to exemption". It appeared, however, that the cemetery company permitted, under a contract, the erection by a mausoleum company at its own expense, of a mausoleum on a part of the cemetery property. The mausoleum reserved the right to sell the crypts and retain the entire proceeds therefrom. For the use of the ground the cemetery company received from the mausoleum company a lump sum payment of $10,000. It also received an additional lump sum payment of $15,000 to be retained by it as an endowment, the income of which was to be applied by the cemetery company to the maintenance of the building. The Supreme Court held that the mausoleum company was conducting its business for profit and that the portion of the cemetery used by the mausoleum company was used for private profit as long as crypts were still being sold, and was not exempt from taxation. In the case of Harrisburg v. Cemetery Assn., 293 Pa. 390, the question arose upon a municipal claim for paving of a street abutting on defendant's property. The initial cost of the land and the expense of laying out and

improving the land had been paid, and the cemetery company had $150,000 in its permanent fund. It had also unsold lots, which when sold would produce half a million dollars. The company was chartered for profit. The court sustained the paving charge.

None of these Pennsylvania cases present the exact facts of the case before us. It appears to the chancellor that the organization of the "association" and its operation as a cemetery, have at least as a part of the stockholder-bondholders' object, the producing of a net cash return to the bondholders of 25 percent over and above their original investment. This conclusion seems inescapable in view of their having issued to themselves $113,375 bonds in lieu of $92,000 stocks, or at the rate of $125 of mortgage for $100 of par value of stock. If it be contended that the profit had already been earned and had already accrued to the stockholders of the old company at the time of the conversion, it still remains that they are continuing the same operation of the same cemetery, though under a new corporate title and charter, in order by sales of lots to convert a sufficient number of lots into cash and thereby receive and enjoy the said profit. This is at least a part of their purpose and object.

Plaintiff contends further that the bonds were the purchase price of the land and that the case is therefore no different in effect than if the "association" had purchased the land and had borrowed the purchase price from a bank, and had given bond and mortgage to secure the debt, and were now paying from time to time part of the principal debt with interest. We cannot adopt this view. A cemetery company may presumably borrow money for its corporate purpose and may out of its income pay interest and principal debt and thus obtain the cancellation of the bonds or notes or the satisfaction of the mortgage given by it. Such transactions may not of themselves inject any element of corporate and private profit into the operation of the company.

But when the mortgage and debt are in effect given by the stockholders to themselves for canceled stock and are to be paid to them by a new company which they organize in order to carry on the same general purpose and business, with no change in the direction and control of the successor company other than a voluntary internal modification whereby the former stockholders take the controls reserved to them by a trust mortgage, we have not the bare case of a corporate debt incurred by a church, charity or cemetery at its institution, or in the subsequent pursuit of its corporate purpose. Neither does the fact that the fair value of the assets delivered to the association was at least equal to the amount of the bonds, nullify the circumstance that at least a part of the object of the association's operations is to return sooner or later a profit to the bondholders of 25 percent upon their original investment.

Plaintiff cites Evergreen Memorial Park Assn. v. Evatt, 141 Ohio 1, 46 N. E. (2d) 286. In that case the Supreme Court of Ohio in a four-to-three decision held the cemetery lands exempt from taxation. The facts were that one Bramson laid out and improved a tract of ground for cemetery purposes and then sold it in a condition substantially complete for cemetery purposes to the corporation when organized. The company was organized "not for profit". The association paid no cash and gave Bramson a mortgage for $60,000, bearing interest. The plan was to pay the interest and principal from the sale of cemetery lots. The majority of the court held that since the land was worth the purchase price, and since any profit which the court ought to consider was limited to profit to be made by the cemetery company and not by the seller of the land, the cemetery was not operated for profit. Three judges dissented on the ground that the company, in which Bramson remained active, was an agency or instrumentality of Bramson. If the majority view was right, the case is distinguishable. Bramson was in the real estate busi-

ness. He did not operate a cemetery but developed a tract owned by him so that it became highly available for cemetery use. In selling this tract to a newly organized cemetery company he did not, like the present plaintiff, carry on his own business under a new form. He was simply a seller of land and became a lien creditor. In the present case, on the other hand, the stockholders after 20 years merely organized their business under a new form.

Plaintiff also cites Metairie Cemetery Assn. v. Board of Assessors, 37 La. Ann. 32. In that case the Supreme Court of Louisiana, by a three-to-two decision, held that the cemetery land and the corporate stock in the cemetery company were both exempt from taxation. In that case the cemetery company was formed with a capital stock of $120,000, divided into 1,200 shares. Eight hundred shares were assigned to the owners of a large tract of land in consideration of its transfer to the corporation. The remaining 400 shares were sold to subscribers for cash. The company developed and improved the tract at considerable expense. Many interments were made and the company continued to operate the cemetery. Surplus receipts were from time to time used to reimburse the stockholders for their contributions. The majority held that no element of private or corporate profit appeared. The dissenting judges pointed out the large profits likely to be produced by the sale of the remaining lots, and the premium which the cemetery stock carried in quotations on the local stock exchange. The court said (p. 35) :

"The sole fact, upon which is predicated the charge of use for corporate profit, is that the corporation sells plots of the ground to persons desiring to build tombs and bury their dead therein, at prices which, if all were sold, would yield a profit on the investment."

It does not appear that the stock brought dividends or yielded income upon the original investment. It

appears rather that the sole distributions were of reimbursed principal. The case appears fairly distinguishable.

Pomfret Manor Cemetery Co. v. City of Sunbury, 4 D. & C. 147, cited by plaintiff, presented the case of a 50-year-old cemetery, not for profit. The court said (p. 150):

"The positive testimony, in fact, the only testimony before us, is that this corporation has never paid nor declared any dividend, that its necessary expenses are in excess of its income, that the interest on its certificates of indebtedness has not been paid, and that it is largely in debt."

The case presented no history of facts comparable to those before us.

Present plaintiff contends that no interest has been paid on the bonds, nor has any deposit been made in the sinking fund for the principal debt. Such is the fact. However, the association has been operating only since January 1, 1943. Its president testified that "the history of all cemeteries has continued to be a burial ground in public favor always increasing value"; that the number of lots sold from year to year had "been increasing up to the time of the war, and then on account of lack of salesmen it started to decrease; and the lack of gasoline, people going to cemeteries except through death necessity, that has caused a decrease in the sales of all lots in all cemeteries in advance of need"; that "cemeteries are strictly a victim of war today"; that "if the war were over tomorrow and six months from now a more normal condition existed, I could say a great many lots would be sold". Defendants also in this connection point out with some force that the book loss of $264.94 for the 1943 business is arrived at only after deduction of an item of $4,147.20 for depreciation, concerning which Mr. Schmidt, a certified public accountant, testified, "That was the depreciation on cemetery improvements. The cemetery improve-

ment item would be capitalized, but the depreciation on the cemetery improvement; that was set up to 1939 by the Treasury Department, and I am still using those figures on the various set-ups". The crediting of a lawfully allowed amount for depreciation for fiscal purposes does not establish that such depreciation was in fact suffered. After 20 years of operation and a payment of a total of 84 percent in dividends, the stock was valued on the books at $175 a share, and for purposes of the bond issue at $125 a share.

Defendants contend also that the court should conclude from the salary paid to the president of the association, that plaintiff's operations are not free from private benefit: Philadelphia v. Overseers of Public Schools, 170 Pa. 257, 263. It could be wished that the record presented more evidence on this head. The salary of $2,400 per annum may be quite reasonable and in fact small: Pomfret Manor Cemetery Co. v. City of Sunbury, 4 D. & C. 147, 150. The determination of this question involves a consideration of the official's duties, his performance of them, and of corresponding salaries for similar duties in similar corporations. Corporations of the first class must, like others, act through agents, and have a right to pay fair and adequate compensation for services performed. The cemetery superintendent is paid $2,600 a year, lives at the cemetery, and devotes all his time to his office. The secretary receives $1,430 a year and has charge of everything in the office. The president testified that he had general executive functions, including directions to the superintendent and to the secretary, and overseeing of the planting. He testified that he had much to do at the time when the cemetery was originally laid out and when the tower and the chapel were constructed. Asked how much time he gives to the position, he was unable definitely to say. He is managing director and president of the Reading Hotel Corporation, and the cemetery company maintains an office in that hotel. No evi-

dence was offered as to salary of the president of any similar cemetery. The burden of proof was on plaintiff, in this respect as in others, to bring itself clearly within the statutory exemption. The matter remains not free from doubt.

### Conclusions of law

1. The premises of a cemetery company, organized as a corporation of the first class, not held for private or corporate profit, and which are intended to hold or contain the bodies of the dead and are in actual use and occupation for the purposes aforesaid, are exempt from taxation for county, township, school district, road board and institution district purposes.

2. In order for the premises in question of the complainant to be exempt from such taxation it is not necessary that all the burial lots, crypts or other burial structures thereon be occupied by the bodies of the dead, if the portion of the premises not so occupied is not unreasonably large, and is maintained, held and occupied as an integral part of the cemetery solely for the purposes specified in the statute.

3. Although a cemetery company, having issued income bonds under a purchase money mortgage, the aggregate principal amount of which is not in excess of the fair value of the premises and assets received by it in consideration therefor, is not for that reason necessarily liable to taxation, such liability may exist because of additional circumstances, if such circumstances inject a partial but actual element of private profit into the debt represented by the bonds.

4. Plaintiff association is not the operator of a burial ground "not used or held for private or corporate profit".

And now, to wit, March 5, 1945, the prothonotary is directed to enter a decree nisi in accordance with the foregoing decision, and forthwith to give notice thereof to the parties or their counsel of record.

*Opinion sur exceptions*

SHANAMAN, J., September 4, 1945.—To the chancellor's decision, plaintiff filed exceptions which embraced no exceptions to the chancellor's findings of fact. Plaintiff, at the argument, summarized the exceptions as follows: (1) That the burden of proof resting on plaintiff does not require that it submit conclusive proof of its right to exemption from taxation; (2) that the question of private or corporate profit must be determined with respect to the taxpayer's use and operation of the cemetery, and not by the use and operation by a predecessor company; (3) that the situation at the time of the assessment and not that at some prior time is the ruling factor, and (4) that the mere fact of payment of salaries to the cemetery company's officers does not by itself introduce an element of private profit into its operations. The validity of these principles neither we nor the chancellor impugn, if properly understood.

On the first head, plaintiff quarrels with the chancellor's use, in his discussion, of the word "conclusively". "Tax exemptions are never lightly to be inferred . . .": Heiner v. The Colonial Trust Co., 275 U. S. 232, 72 Law ed. 256. The chancellor's words "conclusively resolved by evidence clearly demonstrating" imposed no greater burden of proof on plaintiff than the language set forth in the authorities quoted by the chancellor. A claimant that is brought clearly within the exempting statute, Wynnefield United Presbyterian Church v. City of Philadelphia et al., 348 Pa. 252, 255, and a case that is "clearly within it", Y. M. C. A. of Germantown v. Philadelphia, 323 Pa. 401, 408, have—and the chancellor so understood—been conclusively shown to be within it. The right of exemption, being made clear by the evidence or the preponderance

of the evidence, must under the law lead to a judicial conclusion in favor of the exemption.

On the second and third heads of plaintiff's exceptions, the question under the exempting statute is certainly a present one, i. e., whether the assessed property is then, that is to say, at the time of the assessment "used or held for private or corporate profit". But the answering of that question may be affected by relevant considerations arising from the contemplated use and prospective disposition of the property or from the past history of its operation. For example, a cemetery company, in order to show that its vacant area reserved for future burial needs is not presently excessive, may show what is a reasonable expectation of the service to be rendered, and to this end may offer in evidence the past rate of interment during the previous years, and the probable consumption of burial space during future years. Similarly, the corporate history, the fact that no dividends have over a long period of years been earned, declared or paid, the history of the creation of a mortgage on the property, and the circumstances and purposes attending it, may, if material, shed light upon the question as to whether private profit is presently derived or intended in the operation of the company.

Upon the fourth head, the chancellor expressly stated that a corporation of the first class has a right to pay fair and adequate compensation for services rendered it. So far as an officer's salary may exceed such fair and adequate compensation, it may become an element of private profit in the sense of the statute. The chancellor properly held that upon this head the record did not present evidence adequate to sustain the burden of proof which rested on plaintiff.

Upon the evidence the court makes the following additional findings of fact and law:

Finding of fact (additional) 23. The evidence does not clearly show that the plaintiff's entire revenue is

applied to the support of and to increase the efficiency and facilities of Laureldale Cemetery Association, and for no other corporate or private purpose.

Conclusion of law (additional) 6. Plaintiff has not, upon the evidence, brought itself clearly within the statutory exemption from taxation.

And now, to wit, September 4, 1945, plaintiff's exceptions are overruled. Counsel may prepare and submit a proper decree.

### Concurring opinion

MAYS, J., September 4, 1945. — On December 30, 1942, plaintiff acquired two tracts of land from the Laureldale Cemetery Company, the one containing 108.575 acres, excepting therefrom 7.157 acres appropriated by the Pennsylvania Schuylkill Valley Railroad Company, and 2.595 acres appropriated by the Berks and Lehigh Railroad Company, and the other containing 15 acres and 123 perches. In the fall of 1942 the above tracts and one other containing 10.3 acres were assessed in the name of the Laureldale Cemetery Company at $40,000. The record fails to disclose that there was any appeal from this assessment. However, on or about April 20, 1943, the complainant caused an application to be filed with the County Commissioners of the County of Berks for the exemption from taxation of the aforesaid premises. This was refused by the commissioners.

On June 18, 1943, the complainant filed a bill in equity which, amongst other things, prayed for a decree that the real estate (tracts nos. 1 and 2) be declared lawfully exempt from all taxes for school, township, county or institution district purposes. At the trial Mr. Wolfe, for complainant, as the record discloses, propounded this question:

"Now, can we stipulate at this time, Mr. Muth, that the parties have agreed to eliminate from the tract of

land which is in issue in this case, the tract lying to the south of the public road running from the Reading and Pottsville Turnpike to Temple and the tract lying to the east of the Pennsylvania Railroad right of way?"

Whereupon Mr. Muth, solicitor for the County of Berks, stated:

"I agree to that, with this addition, that these two small tracts, being part of the property of plaintiff, one of them containing 15.77 acres and the other 10.3 acres, have been separately assessed for tax purposes for the County of Berks and the School District and the Township of Muhlenberg by agreement of plaintiff."

Paragraph 4 of plaintiff's bill, in referring to the two tracts, one containing 98.82 acres and the other 15 acres and 123 perches, averred that "the said premises, together with the buildings and improvements thereon, are used exclusively as a cemetery. They are not used by any third person for any other purpose". Mr. Wolfe, for the complainant, made the assumption that in view of the elimination of two tracts, paragraph 4 of the bill of complaint is no longer in issue, whereupon Mr. Muth stated:

"I don't think I can agree to your proposition with reference to paragraph 4 because it may appear that portions of tract no. 1, containing 98.82 acres, may also not be used for cemetery purposes, and that I don't know."

Because of the conclusion that I have come to, I need only apply the law to the facts which I have just set forth.

In 1942, when the assessment was made, the land was owned by the Laureldale Cemetery Company, a corporation for profit, and was assessed as one property. At that time surely there was no right of exemption. It was not only the right of the taxing authorities, but their duty, to assess the property for taxation. On December 30, 1942, as already pointed out, there

was a conveyance of this property to the complainant who, according to the bill, claims that some of the land so assessed for the taxing year 1943 was exempt. Even if that right was in the complainant, it should have appealed from the refusal of the county commissioners to declare the property exempt. In Dougherty v. City of Philadelphia et al., 112 Pa. Superior Ct. 570, it was said (p. 578):

"In the case of Laymen's Week-End R. L. of Phila. v. Butler, 83 Pa. Superior Ct. 1, 6, we said: 'As part of the property is not exempt from taxation it follows that the bill in equity was rightly dismissed.' The remedy available to the owner was an appeal from the tax assessment . . . As part of the premises were subject to taxation, it therefore becomes necessary to dismiss the bill."

This case was cited with approval in Kittanning Borough v. Armstrong County et al., 347 Pa. 108, 110. Chief Justice Maxey, at p. 110, said:

"Where part of a property is not exempt from taxation, a bill in equity to restrain collection must be dismissed . . ."

I do not have to give any consideration to the question as to whether the entire property as alleged in the bill was exempt. It is sufficient to say that the complainant in the subsequent year agreed that the tract containing 15 acres and 123 perches, and another tract containing 10.3 acres, were not tax-exempt. Whether the 10.3-acre tract is a part of tract no. 1, I am unable to say. It is clear, however, that there is, according to the record, no conveyance to the complainant of any 10.3-acre tract. It is thus clear that the complainant concedes that some portion of the property as assessed in 1942 is taxable. It was held in Wynnefield United Presbyterian Church v. City of Philadelphia et al., 348 Pa. 252 (syllabus):

"Where an owner of a tract of land concedes that part of it is taxable but contends that inadequate exemption has been allowed as to another part, the sole remedy is by appeal from the assessment, as provided by statute."

It was definitely held in First Baptist Church of Pittsburgh v. Pittsburgh et al., 341 Pa. 568, that (syllabus):

"The jurisdiction of equity to restrain attempted taxation is limited to cases in which there is a total want of taxing power; in other cases the remedy is by an appeal to the common pleas from the action of the Board of Revision."

Admittedly, in 1942 there was the power to tax. The decision of the taxing authorities was final and conclusive, no appeal having been taken from the assessment.

The taxes for the year 1943 were assessed in the latter part of 1942. They were by express terms of the statute liens from the date of their assessment. "All taxes . . . assessed on any property in this Commonwealth . . . are . . . declared to be a first lien on said property . . . : Act of May 16, 1923, P. L. 207, sec. 2, 53 PS §2022.

A similar provision of a statute was construed in City of Philadelphia v. Pennsylvania Institution, 28 Pa. Superior Ct. 421, 424, where it was said:

"Tax is assessed in Philadelphia prior to the beginning of the tax year, and the whole tax is due at the beginning of the year . . .

"No appeal having been taken from the assessment of the tax in question, the decision of the taxing officers became final and conclusive.

"It was said in Moore v. Taylor, 147 Pa. 481, that 'the duty of taxing officers is quasi judicial, and it is well settled that when the general power to assess exists, the remedy for illegal taxation is by appeal. If

none be given, neither the common pleas nor this court can reverse the judgment of the taxing officer'.

"It was decided in Shaw v. Quinn, 12 S. & R. 299, that the person charged at the beginning of the year is liable for the taxes of the whole year though he alien before the date of appeal.

"At the time the tax in question was charged and became payable, it was charged against the appellee and a lien against its land. It became so by the action of the taxing authorities, who fixed the liability according to the statute regulating the subject. We have not been shown any authority authorizing the court in a proceeding to enforce the collection of the tax so regularly assessed and filed, to relieve the property from the charge. The Act of April 26, 1893, P. L. 25, makes it the duty of the board of revision of taxes in any city of the first class, to add to the assessment books any real estate which had ceased to be entitled to exemption because no longer occupied and used for a purpose entitling it to exemption; said taxation to be for the proportionate part of the year, but no statute provides for the exemption of property for a portion of the year which may be applied during the tax year to such uses as exempted it from taxation."

If the complainant is entitled to exemption, the exemption does not start with the year 1943, but if it begins at all, it does not do so until the ensuing year.

Goodrich, Cir. J., in United States v. Certain Parcels of Land in Philadelphia, 130 Fed. (2d) 782, at p. 784, in discussing tax-exempt property, and when exemption applies, said:

"The result is supported also by the well-established doctrine in Pennsylvania that although property becomes exempt from taxation during the taxable year, the exemption does not begin until the ensuing year

and taxes assessed prior thereto are neither diminished nor pro-rated."

He cites as an authority W. G. Halkett Co. v. City of Philadelphia, 115 Pa. Superior Ct. 209, where the Superior Court affirmed, per curiam, the opinion of Judge Stern, who, at p. 210, said:

"That the taxes due January 1, 1932, were collectible by the city is in the opinion of the court free from doubt. The law is certain to the effect that the taxable status of property is determined as of the time when the assessment is levied and the tax is due, and even if during the year the property is transferred to an owner in whose hands it is exempt, the exemption is not retroactive, but on the contrary does not commence until the next following date of assessment. There are many cases in Pennsylvania to this effect, as, for example, Philadelphia v. Pennsylvania Company for the Instruction of the Blind, 214 Pa. 138."

The bill should be dismissed.

### Dissenting opinion

SCHAEFFER, P. J., September 4, 1945.—After careful consideration I have come to the conclusion that the exceptions to the chancellor's decision should be sustained. Plaintiff claims that the lands in question are exempted from taxation by paragraph (b) of section 204 of The General County Assessment Law of May 22, 1933, P. L. 853, 72 PS §5020-204, which is as follows: "The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit: . . .

"(b) All burial grounds and all mausoleums, vaults, crypts or structures intended to hold or contain the bodies of the dead, not used or held for private or corporate profit."

The chancellor's various findings of fact properly state the facts. We have here a cemetery association

incorporated as a nonprofit corporation which owns the cemetery here in question. The chancellor finds as a fact that the unsold and unimproved portions of the cemetery are not excessively large under the circumstances and that therefore the whole of the tract is exempt from taxation "if it has been shown to be not held for private profit".

The chancellor does not find that the tract is held for private profit but has concluded that plaintiff has not shown that it is not so held.

As set forth in his opinion, the chancellor's doubts appear to arise from the prior history of the cemetery coupled with the fact that plaintiff's mortgage bonds are held by the shareholders of the former cemetery company plus the fact that the management of plaintiff association is vested in a group of the former shareholders. Plaintiff, after incorporation, acquired the tract in question by deed from the Laureldale Cemetery Company, a corporation for profit, and, in consideration thereof, executed simultaneously a mortgage to the Berks County Trust Company, trustee for $113,375, wherefore the trust company, as trustee, issued bonds pro rata amongst the former shareholders of the grantor cemetery company. As the chancellor has found, the actual value of the real and personal property so transferred to plaintiff was at least equal to the amount of the indebtedness secured by the mortgage. These facts, coupled with the facts that the former shareholders had received dividends of 86 percent in less than 20 years from the cemetery company, and that these shareholders are given a paper profit of 25 percent in exchanging their stock for bonds, seem to lead the chancellor to the conclusion that the nonprofit status of plaintiff is not clearly established. But plaintiff's status as a nonprofit corporation is not to be determined by what the original cemetery company

did nor by the fact that the shareholders of that original company have made a profit. Obviously the converse would not follow.

Whether or not the cemetery lands are exempt from taxation must be judged by facts which existed on December 30, 1942, the date of transfer, or which have arisen subsequently: W. G. Halkett Co. v. City of Philadelphia, 115 Pa. Superior Ct. 209. Accordingly, this decision may not rest upon the prior history of the cemetery or upon whether or not the cemetery company's shareholders found this investment to be profitable or not.

The proof of plaintiff's right to exemption is not subject to any special formula; it is an issue of fact in a civil proceeding. Such proof should outweigh the proof to the contrary but it is sufficient if it tips the scales. The proof is sufficient if it enables the court "to find" the right to exemption: Union Trust Company of Pittsburgh's Account, 326 Pa. 251, 256. We start with the presumption that all land is subject to taxation; but this presumption disappears when the owner points to a statute exempting it and offers proof that the land is within the terms of the statute. If there be such a statute and the proof that the res is within the language and intent of the statute outweighs the proof to the contrary, a court should declare the land exempt.

Here this is no dispute as to the existence of the statute of exemption. Nor do I find any difficulty in declaring that plaintiff has shown that the tract in question falls within the language and intent of its provisions. The lands are burial grounds not unreasonably large for this community in the years just ahead; these lands are owned by plaintiff which is incorporated as a nonprofit association. Nor is there any evidence from which we think that it can be inferred that the lands are used or held for private profit. If we are correct in holding that this question must be deter-

mined from the facts existing at or after the transfer of the lands to plaintiff, the profit made or to be made by the shareholders of the original company is irrelevant. The status, we think, is exactly as it would have been if the mortgagee had itself held the mortgage bonds for its own account and paid off the present bondholders in cash. The only other element of profit referred to in the testimony is the salaries paid to plaintiff's president, superintendent and secretary. But these are the same salaries which were paid to the same persons for the same work by the former cemetery company, a shareholders' company organized for profit. Certainly we are not justified in concluding that the company existing for the profit of its shareholders, some thirty in number, voluntarily paid excessively large salaries to its officers and employes. The payment of these salaries does not support the conclusion that the recipients thereof are receiving a personal profit, that is, an excess over the reasonable value of their services.

In my opinion the uncontradicted testimony which we are not at liberty to disbelieve inevitably leads to a finding by the court that the cemetery lands are exempted by the statute.