Philadelphia, Appellant, *v.* Overseers of Public Schools.

170      257
29 SC   47

170      257
36 SC  109
36 SC  112
36 SC  113

*Taxation—Charity—Exemption from taxation—School.*

Where a corporation, organized for the establishment and maintenance of a school wherein the children of the rich may be educated at reasonable rates and the children of the poor gratuitously, purchases land and erects buildings thereon, and lets them as an educational venture for a rental equal to one eighth of the gross receipts, to an individual, the corporation paying to him from the charity fund tuition fees for the instruction of the free pupils, and the number of free pupils are only sixteen out of a total of three hundred and fifty-nine pupils, the property of the corporation is not used for the purposes of a purely public charity, and is not exempt from taxation.

Argued Jan. 10, 1895. Appeal, No. 379, Jan. T., 1894, by plaintiff, from judgment of C. P. No. 3, Phila. Co., Sept. T., 1889, M. L. D. No. 1, dismissing exceptions to report of referee. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Scire facias on lien for taxes.

The case was referred to J. Levering Jones, Esq., as referee, who reported in favor of defendant.

The facts appear by the opinion of the Supreme Court.

Exceptions to the referee's report were overruled.

*Errors assigned* were in overruling exceptions and entering judgment for defendant.

*E. Spencer Miller, Isaac H. Shields,* assistant city solicitor, and *Charles F. Warwick,* city solicitor, with him, for appellant.—A school, conducted as a money-making business cannot confer the privilege of exemption from taxation upon the real estate it occupies.

It is submitted that corporate profit excludes the application of the act of May 14, 1874, as effectually as does individual realization of profit : Philadelphia v. Barber, 160 Pa. 123.

The word "institution" in the constitution and the other designative words in the act of 1874 apply to the physical, tangible establishments, and not to the corporation which owns

the establishments: American S. S. Union v. City, 161 Pa. 307; Mercantile Library Co. v. City, 161 Pa. 155; City v. Barber, 160 Pa. 123.

If the enterprise is conducted in such a manner as there are practical and substantial elements of profit realized in the institution, the right accrues to impose a tax at least in proportion to the part of the property so used. This principle applies :—

(1) Where the portion of the property so used is separate from that used for the charitable purposes: Mercantile Library Co. v. City, 161 Pa. 155.

(2) Where the productive use is so molded as to aid the charitable object: American S. S. Union v. City, 161 Pa. 307; City v. Barber, 160 Pa. 123.

We submit it should apply as well—

(3) Where the productive use is so shaped and disposed that the profit passes to a person other than the corporation, to which the management is, in a more or less degree, turned over.

*John G. Johnson, James Wilson Bayard* and *Frank P. Prichard* with him, for appellee.—The appellants have overlooked the very recent case of Philadelphia v. Penna. Hospital, 154 Pa. 9, in which the city attempted to tax a certain building of the Pennsylvania Hospital which was reserved exclusively for the use of patients paying a higher rate than any others. The payments exceeded the cost of maintenance of the building, and, excluding the cost of the building and plant, an income was received. The arguments made in the present case were pressed upon this court by the very counsel who represent the city in this appeal; but this court decided that it was not proper to exclude the cost of the real estate and plant in estimating whether an income was produced.

It has been settled in Donohugh's App., 86 Pa. 306; Northampton County v. Lafayette College, 128 Pa. 147; City of Philadelphia v. Women's Christian Association, 125 Pa. 572, and Episcopal Academy v. City of Philadelphia, 150 Pa. 565, that a charity is no less a charity because it makes a charge to the recipients of its bounty.

As to the proposition contended for by the appellant, namely, that the trustees of this charity have turned it over to an indi-

vidual for his private benefit, it would seem that such a charge as this should be supported by some testimony, and that in the face of a report of a referee, affirmed by the court below, an appellant, who undertook in this court to contend that the trustees of a charity, having a very large amount of property intrusted to their care, had in violation of their trust turned over the funds of the property to an individual for the purpose of private gain, should point out very clearly to this court evidence which would justify such allegation. In point of fact there is nothing in the evidence which in any way indicates such an extraordinary state of affairs.

This act of May 14, 1874, P. L. 158, is unconstitutional: Donohugh's App., 86 Pa. 306 ; Burd Orphan Asylum v. School Dist., 90 Pa. 21.

The test of "maintenance by charity" is not the source of the income of the institution nor the proportion which the income from charitable sources bears in its expenditures to the payments received by it from its beneficiaries: Donohugh's App., 86 Pa. 306 ; Northampton County v. Lafayette College, 128 Pa. 147 ; Philadelphia v. Women's Christian Association, 125 Pa. 572 ; Miller's App., 10 W. N. C. 168 ; Thiel College v. Mercer County, 101 Pa. 530 ; Burd Orphan Asylum v. School Dist., 90 Pa. 216.

Where it does not clearly appear from the charter that the institution is, by its organic law, a charity, its history and practice may be inquired into for the purpose of determining its character, and, in that event, the source of its income becomes, like any other piece of evidence, a matter for consideration: Hunter's App., 22 W. N. C. 361 ; Philadelphia v. Women's Christian Association, 125 Pa. 572 ; Episcopal Academy v. Philadelphia, 150 Pa. 565.

When the institution is, by its organic law, a charity, and when it continues to be carried on by the instrumentality devised by the original donors for the purpose, and by authority of the original charter and without any purpose of private gain, it is impossible to say that it is not maintained by the charity.

OPINION BY MR. JUSTICE DEAN, October 7, 1895 :

The city of Philadelphia sought to enforce a lien for registered taxes against lots 8 and 10 on west side of Twelfth street,

south of Market, having thereon erected two three-story brick buildings, used for school purposes. The property is owned by the defendant, a very ancient corporation, dating its original grants back to William Penn.

These grants of 1701, 1708 and 1711 defined the object of them to be the establishment and maintenance of a public school, wherein the children of the rich might be educated at reasonable rates, and the poor gratuitously; the school to be under the care and management of a board of overseers. The school was kept up from the date of its foundation, until the year 1874, when it had run down to very few pupils. The corporation at this time having an income from investments, these, to a considerable amount, were put into the present property, and additional money borrowed on mortgage; the present lots and buildings represent a total cost of $75,721.12. In 1874, the overseers made a contract with Richard M. Jones as head master, which stipulated, the corporation would furnish the buildings, furniture, school apparatus, fuel and repairs, while it should receive one eighth of the gross receipts for tuition, including in this estimate the tuition fees of such poor children as were educated gratuitously, at the expense of the corporation; the head master to receive the seven eighths of all the receipts, and pay thereout the salaries of all subordinate teachers; the teachers selected to be subject to the approval of the overseers. It was further guaranteed the head master's compensation should not be less than $2,000; if in any year there was a deficiency it should be made up from the funds of the corporation.

The overseers receive no compensation for their time or services. Bequests and legacies, since the school was established, have been made to it, from which is derived an annual average income of about $3,800. Under the management of head master Jones, the school has enjoyed almost phenomenal prosperity. Soon after he took charge, in 1876, the number of pupils was 52; of these, 41 were paying students and 11 free; six years afterwards, they numbered 135, of whom 20 were free; in 1892, the number reached 359, of whom 16 were free. The amount received from pay scholars, this year, is not given, probably because, at the date of the hearing, the accounts for that year had not been summarized; but in the year previous, 1891, when

the whole number was 300, of whom 15 were free, the receipts from pay scholars for tuition alone were $48,606.35; in addition to this, there was a moderate profit on books and stationery furnished, also on refectory charges and diploma fees. Master Jones's portion of the receipts for this year was net $12,633.55, and the balance in favor of the overseers was $2,406.24. There having been an increase of 43 pay scholars and one free scholar the following year, the share of the head master must have been considerably greater.

There is no doubt, the institution in its foundation was, so far as pupils were taught free, a charity school, and although its operations prior to 1874 and 1875 are not shown, probably, up to that time, it was carried on as originally founded. But at that date, the undisputed testimony is, it was incapable of survival on its ancient foundation and methods of management. It had but 17 free pupils to be educated from a fund worth, probably, more than $60,000. Obviously, in a large city like Philadelphia, neither the benevolent intentions of the founder, nor the desires of those who had charge of the school, were being accomplished. The results were in no way commensurate with the scope of the project nor even with the means provided for carrying it out. This evidently was the alternative which then presented itself to the overseers; the school must be put on a paying basis, or must stop. Although this conclusion is not distinctly stated in these words by any witness, a fair consideration of the testimony of head master Jones, overseers Thomas Wister Brown, James Whitall and clerk Edward Bettle shows that it was practically the one at which they arrived, and doubtless, too, a correct one. They then, instead of persisting in the old way which at best gave a sickly existence to a small school, wisely resolved to adopt a new plan which would make it self supporting, greatly increase the number of pupils, and thereby enlarge its usefulness. A new location for the school was adopted, larger and more commodious buildings erected; a contract was made, as the event showed, with a most capable head master; his energy and efficiency were stimulated by a provision whereby his money receipts in a large degree depended on the success of the school. In other words, the school was to be made to pay, and it did pay. But by the new method, was there any promotion of the charity element which

was one of the two objects of the founder? When master Jones
in 1874 first took charge there were 17 boys in the school; there
are now 360; but the number of free scholars was, in some
years, less than the original 17; the highest number in any one
year was 26; the last and most prosperous year only 16. As
enjoined by the charter, children were to be " admitted, taught
and instructed, the rich at reasonable rates, and the poor to be
maintained and schooled for nothing." The rates paid by those
able to pay, for the " rich," in 1876, the second year, amounted
to $5,410.17; fifteen years afterwards in 1891, the same class
of patrons paid $54,880.93; as a result of this progress, we look
to see the corresponding benefit to the poor, who were to be
taught for nothing, and we find, in the first mentioned year 11
pupils of this class were taught, in the last named year 15, an
increase of but 4; the income has increased about one thousand
per cent, the free scholars not thirty per cent. Success has not
been in the line of the charity, but in the building up of a live,
efficient school for those able to pay.

It seems to us this school is a business enterprise; that the
benefit from its success is largely gathered from those whom
the founder termed the " rich," and by the head master, Mr.
Jones, instead of by the corporation, is significant of its char-
acter. He receives seven eighths of the income, the corpora-
tion one-eighth, the latter furnishing the building, fuel and
light; for tuition of the free scholars, it pays at fixed rates out
of its income raised from the foundation, endowments and leg-
acies. In substance, the corporation leases its property to
master Jones for one eighth of the gross receipts from all the
pupils for tuition. If the corporation contracted with a pri-
vate school for the tuition of ten to fifteen pupils annually, and
paid this out of the income from the charity funds, or from the
rents of real estate in which the funds were invested, such pri-
vate school would not, as an institution of purely public char-
ity, be exempt from taxation. When lots are purchased and
buildings erected, and these, practically, let as an educational
venture for a rental equal to one eighth of the gross receipts,
to an individual, the corporation paying to him from the char-
ity fund tuition fees for the instruction of the free pupils, cer-
tainly the property is not a purely public charity. The school,
thus established and carried on, has not the elements of a pub-

lic charity; it is a purely educational enterprise, under the control of, and carried on by an individual, in direct competition with other private schools, which last are rigorously taxed. The head master does not want pupils who do not pay their rates; he admits none who do not; the small number who do not themselves pay are paid for by the corporation.

We have no word of dissent from the entirely commendable sentiment of the learned referee, approved by the court below, when he says: "It may now be said, that educational institutions, of a distinctly non-sectarian character, conducted solely for the benefit of the public, without any element of private gain, relieving the state from taxation, and extending knowledge to some who would otherwise not be able to obtain it, are institutions of a purely charitable nature, and exempt from taxation."

The trouble in the application of this sentiment to the case in hand is, that it does not fit the facts as found by the referee; this institution is not conducted solely for the benefit of the public, any more than is the street passenger railway conducted for the benefit of the public; those of the public who can pay can ride; here, those of the public who can pay tuition fees are benefited by an education, just as they might be benefited in many other excellent private schools in Philadelphia, where exemption from taxation is not thought of. Nor is this institution without an element of private gain; we doubt, if there be anywhere else in the land, in a school of like grade, an educator in receipt of a salary equal to the one thousand dollars per month received in 1891 by master Jones, as his share of the profits in this enterprise —for this last is clearly what it is— notwithstanding this share is denominated salary in the argument, by no stretch of construction can it be so denominated in the instrument, which reads thus:—"The corporation, to provide the building, furniture, school apparatus, fuel and repairs; and to receive one-eighth the gross receipts, including in the estimate of receipts, the tuition fees of such poor children as may be schooled at the expense of the corporation; the head master to receive the remaining seven-eighths, and pay thereout the salaries of all his subordinates, and all expenses pertaining to conducting the school, other than are hereinafter mentioned as chargeable to the corporation. The assistant teachers

to be selected by him, and appointed, subject to the approval of the overseers; and that he be guaranteed that his net income from the school, shall not fall below $2,000 in any school year, the deficiency, if any, to be made up from the educational funds of the corporation." The head master is to have all the profits on seven eighths of the gross receipts, whether five or fifty thousand dollars, with a guaranty that these profits shall in no case fall below two thousand dollars. This is a business project, wherein the returns from capital and professional acquirements depend on good fortune and good management, just as in other business ventures.

Nor does the school relieve the state from taxation. Under authority from the state, the municipality of Philadelphia, by taxation, provides for the education of every child within its limits, and this burden is in no appreciable degree lightened by the establishment of private schools. The charity had its foundation when no such complete and beneficent system of education as that created by the commonwealth had an existence, or was dreamed of by William Penn. If such a system had been in operation in the small town on the Delaware, in 1708, or if at that time he had had reason to anticipate such an one would be adopted in the future, it is probable his benevolence would have taken some other direction. At this day, when the city raises by taxation and expends sufficient money to educate every child, rich and poor, the private school in no sensible degree relieves the public burden; if it be exempted from taxation, the public burden is increased by imposition of the exempted tax upon. others who share not in the gain from the private enterprise.

It may be properly said of the managers and head master of this school, when its methods had fallen behind the times, and in its struggle alongside the public school its life had almost ended, they, by wisdom and energy, infused into it a new life; have made it highly prosperous, and not only prosperous but highly beneficial to all who are able to pay for its privileges; but this does not make it purely charitable; the 343 pay scholars of 1892, who paid nearly $50,000 for their tuition, would hardly take that view. We certainly do not.

None of the cases cited by the referee reaches the facts of this case. The rule applied in Miller's App., 10 W. N. C. 168;

Thiel College v. the County of Mercer, 101 Pa. 530, and Hunter's App., 22 W. N. C. 361, is the one applicable here. In this last case, it is said: " The Academy is maintained from the income derived from such property as has been given to and purchased by it, and from fees for tuition, which are at a much lower rate than institutions of a like grade. . . . It was incumbent on appellees to show that the institution under their care is, at least, substantially maintained by public or private charity. This has not been done. On the contrary, it may be fairly inferred that its chief source of maintenance is and has been tuition fees. If so, it cannot, in the constitutional sense, be regarded as an institution of purely public charity."

The judgment is reversed, and judgment is now entered for the city of Philadelphia, and against defendant, on the facts found by the referee.