## Ogontz School Tax Exemption Case.

Argued January 3, 1949. Before MAXEY, C. J., DREW, STERN, PATTERSON, STEARNE and JONES, JJ.

*David E. Groshens,* for Township of Abington, appellant.

*Percival R. Rieder,* for School District of Abington Township, appellant.

*Frederick B. Smillie,* with him *Gilbert P. High* and *Smillie, Bean & Scirica,* for Ogontz School, appellee.

*Alexander Knight,* for Board for the Assessment and Revision of Taxes of Montgomery County, appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, March 21, 1949:

This is an appeal by the Township of Abington and the School District of Abington Township from the action of the Board for the Assessment and Revision of Taxes of Montgomery County in exempting from taxation the real estate situate in Abington Township, Montgomery County, Pa., owned by The Ogontz School. Both the Township and the School District appealed to the Court of Common Pleas of Montgomery County and that Court, after a hearing, dismissed the appeal and affirmed the action of the Board for the Assessment and Revision of Taxes in exempting from taxation the real estate of the school. Exceptions were filed and dismissed and this appeal followed.

The Ogontz School, located in Abington Township, Montgomery County, owns 82 acres of land in that Township. Forty-seven acres of this land had been owned by the school, a non-profit corporation, and by its predecessor in title, The Suburban Academy, Inc.,

and by The Ogontz School, a business corporation, since prior to February 5, 1929. On that date, the business corporation conveyed to The Suburban Academy, Inc., all of its assets. The latter, a non-profit corporation, had obtained its charter on January 22, 1928. On November 29, 1929, the name of The Suburban Academy, Inc., was changed to The Ogontz School.

Since February 5, 1929, this 47 acre tract of land and the buildings thereon has been exempt from taxation. The assessed value of this property is $762,500. In August 1945 The Ogontz School acquired title to an adjoining tract of land in Abington Township, comprising about 35 acres, and paid therefor $75,000. This tract is assessed at $40,000 and has also been exempted from taxation by the Board for the Assessment and Revision of Taxes of Montgomery County.

The Ogontz School was founded in 1850 and was known as the "Chestnut Street Female Seminary". Shortly afterwards it moved to Cheltenham Township and in 1915 it moved to Rydal, in Abington Township. In 1915 The Ogontz School was incorporated as a business corporation to operate a private school for young ladies. The owner of the school at that time was Miss Abby Sutherland. In 1929, when the business corporation transferred title to the property, then consisting of 47 acres, to the non-profit corporation, The Suburban Academy, Inc., later changed to The Ogontz School, Miss Sutherland was the sole shareholder of the business corporation. It was for the specific purpose of taking over the assets of the old business corporation that the non-profit corporation, The Suburban Academy, Inc., later changed to The Ogontz School, was formed. The non-profit corporation, The Suburban Academy, Inc., acquired all the assets of the business corporation and took title to the real estate consisting of 47 acres, subject to a mortgage indebtedness of about $450,000. The consideration for the conveyance by the business

corporation to the non-profit corporation was $150,000, secured by the second mortgage bonds given by the non-profit corporation to the business corporation. The non-profit corporation assumed all the debts of the business corporation. The latter then turned over to Miss Sutherland the second mortgage bonds of the non-profit corporation in consideration of her surrendering her stock in the business corporation. These second mortgage bonds have been paid and the school is no longer indebted to Miss Sutherland. Since 1929 The Ogontz School has paid off other indebtedness amounting to $400,000.

The charter of the non-profit corporation, The Ogontz School, states its purpose as being the "maintaining, supporting and operating a school or academy for the education of young men and young women, without profit, partly from funds contributed by members and partly from tuition fees".

Most of the buildings of The Ogontz School are located on the 47 acre tract acquired in 1929. In these buildings there are classrooms, dormitories and dining rooms. Near the main building is The Cabin Building, used for student recreational purposes. At the entrance to the property is a stone house, "Lares", which is occupied by Miss Sutherland, president of the school, and also by ten girl students and two teachers of the school. This building is also used for the practice of home economics. Other buildings on the 47 acre tract are a chemical laboratory, a small greenhouse, an art studio, a dormitory, a classroom and dining room building, a kindergarten building, a faculty dormitory building, another Home Economics building, a servants' dormitory, and a barn. A section of the property is woodland and another part of the tract is used for an athletic field, hockey field, tennis courts and competitive drill field. The 35 acre property, known as the Fry property, is across the street from the main build-

ing. On this 35 acre tract there is a dormitory and a garage and also a cottage used by the employes of the school.

The school has an enrollment of about 300 students, 100 of whom are in the Rydal Grade School. Except for a few boys in the kindergarten and two lowest grades of Rydal Grade School, the student body is made up entirely of young women. In admitting students to The Ogontz School there is no discrimination on account of race, creed or color. Entrance requirements are based on scholarship, general health and character. The basic cost of attending The Ogontz School, including tuition, board and lodging, is $1,900 a year. There are extra tuition charges for students studying voice and piano. The costs of attending the school are about $100 a year more than they were under the business corporation.

The control and management of the School are under a Board of Trustees who serve without compensation. Miss Sutherland is the president of the School and chief administrative officer. The Board of Trustees control the finances of the School and no trustee has any pecuniary interest in the earnings. From the time Miss Sutherland became president of the non-profit corporation in 1929 until 1935 or 1936 she received an annual salary of $20,000. Since that time her salary has been $8,000 a year. She also receives living quarters in the building known as "Lares".

According to the School's balance sheet, dated September 30, 1945, the fixed assets of the school, including buildings, grounds, improvements, fixtures and equipment, less a depreciation reserve of $403,098.54, are worth $496,861.31. $32,000 of this amount represents real estate and improvements of White Mountain Camp, a self-sustaining summer camp owned and operated by the School in New Hampshire. The mortgage indebtedness on the school properties on September 30, 1945, was $40,000. This debt was created in 1945 in order to

purchase the Fry property of 35 acres. The capital account is made up of the following two items: (1) General Fund Capital—$182,241.35, and (2) Surplus—$198,423.78.

The A. A. Sutherland Endowment Fund, carried on the balance sheet at $69,800, was created when Miss Sutherland gave the School three properties. They were a part of the 47 acres constituting the school campus and had been included in the transfer in 1929 of the school properties to the non-profit corporation. In 1940 Miss Sutherland purchased these properties for $63,662 from the School in order to provide the School with cash funds to meet its then financial needs and she also paid off encumbrances amounting to $16,500. In 1945 she gave these properties thus valued at about $80,162 to the School and they now constitute the endowment fund above named. There is also a Chapel Fund, composed of $13,976.56 in cash and $1,162.50 in United States Bonds, for the future construction of a chapel for the school. There is also a $443.75 Heathcote Foundation Fund created through voluntary gifts to the School.

Except for a rather negligible yield on these endowments the School's source of revenue is solely from tuitions. The statements of Income and Expenses for the years 1944 and 1945 show that the School received from tuitions sufficient revenue to defray all operating expenses and to set up an ample depreciation reserve. The operation of this School in 1945 resulted in a surplus to the School, after depreciation allowances, of $50,941.40. The corresponding figure for 1944 was $14,907.86. In 1943 the total income exceeded expenses, before depreciation, by $7,437.90. Deducting depreciation there resulted a net loss for that year in the amount of $10,799.22.

The Ogontz School's claim to exemption from taxation is based upon Article II, Section 204, of the Act of May 22, 1933, P. L. 853, as amended by Section 1 of

the Act of May 3, 1943, P. L. 158 (72 PS 5020-204), which provides: "The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit:—(c) All hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence, or charity, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed, and maintained by public or private charity: Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose."

Constitutional authority for the enactment of such legislation exempting from taxation "institutions of purely public charity" is given by Article IX, Section 1, of the Constitution of Pennsylvania, which reads as follows: ". . . the General Assembly may, by general laws, exempt from taxation public property used for public purposes, actual places of religious worship, places of burial not used or held for private or corporate profit, institutions of purely public charity, and real and personal property owned, occupied, and used by any branch, post, or camp of honorably discharged soldiers, sailors, and marines."

For The Ogontz School to obtain the claimed exemption from taxation it must affirmatively show that it is "an institution of purely public charity . . . founded, endowed, and maintained by public or private charity". In *Young Men's Christian Association of Germantown v. Philadelphia*, 323 Pa. 401, 187 A. 204, we pointed out that such institutions are not made exempt from taxation because of the state's philanthropy, but that "There are substantial reasons why an institution wholly devoted to public charity should be exempt from taxation, since one of the duties of the government is to provide

food and shelter for the poor. Any institution which by its charitable activities relieves the government of part of this burden is conferring a pecuniary benefit upon the body politic, and in receiving exemption from taxation it is merely being given a 'quid pro quo' for its services in providing something which otherwise the government would have to provide."

The Ogontz School relieves government of none of its burdens and under no test can that School be classified as an institution of "purely public charity". Each year the School provides from two to four full scholarships and from fifty to seventy-five partial scholarships. Respective counsel have submitted a statement showing the value of the full and the partial scholarships for the years 1937 to 1944, inclusive. For the four years from 1941 to 1944 the value of the full scholarships each year was $3,600 and the value of the partial scholarships for those years was, respectively, $48,612, $38,340, $43,095, and $31,220. The total value of all the scholarships for the eight years was $385,357, or an average of $48,168.75 annually. This is equivalent to about 25 full scholarships, each worth $1,900. Since the Ogontz School, including the Junior College, has 205 students and there are 125 students in the Rydal School, the value of the free scholarships amount to a sum equal to about 10% of the total fees paid by the students. An institution whose free patrons number only about 10% of all its patrons cannot be classed as an institution of purely public charity. Furthermore, it is obvious that the scholarships are maintained out of the payments made by the vast majority of the students who pay the full fees charged them. Therefore, these paying students instead of being the beneficiaries of a public charity are really maintaining a private charity to the extent that their fees are used in part to pay for the free scholarships nominally "given" by the School. In other words, 10% of the students are getting something which

they do not pay for and 90% of the students are paying for 10% more than they get. If, for example, an hotel would provide free broad and lodging each day to 10% of its patrons it could not properly be classed as an "institution of purely public charity". A physician who devoted 10% of his professional efforts to indigent patients could not consider himself as purely, i.e., wholly, engaged in public charity.

On behalf of Appellee it is contended that "The Ogontz School was originally endowed by a gift of real estate valued at $762,500.00, and has since received further endowments of real estate valued at $69,800.00, and cash of $15,582.81." The record does not support this statement. The Ogontz School was not founded by public or private charity, except to the extent of $162,500.00 (the difference between its assessed valuation in 1929 and the total of its then mortgage debt). This "non-profit corporation" was formed in 1928 for the purpose of taking over the assets of the old business corporation. The latter's property at that time was encumbered with a $450,000 first mortgage indebtedness. There were also issued bonds of the face value of $150,000, secured by a second mortgage on this property, and these bonds were given to Miss Sutherland, the sole shareholder of the business corporation. She became president of the new corporation at a salary of $20,000 a year until 1936, when the salary was reduced to $8,000 a year. She also received the use of a house and was provided with maintenance. These bonds and $400,-000 of the first mortgage indebtedness have been paid from the School's profits. An institution which can from its earnings liquidate $550,000 of an indebtedness, with interest, during a period of fifteen years is clearly not being operated as an institution of public charity. Even if it had received *all* of its real and personal assets as a gift and then had operated on a self-sustaining basis, the mere fact of its exclusively charitable origin

would not make it an institution "endowed and maintained by public or private charity". If, for example, the owner of an hotel would present it to a friend as a gift, and the friend continued to operate it as an hotel, charging rates that yielded annual profits or even made it self-sustaining, that hotel would not have the character of "an institution operated for purely public charity". And this would be true even if the proprietor used the profits of the hotel only to enlarge the hotel and to increase its equipment after paying himself a substantial salary for managing it.

In the *Germantown Y. M. C. A.* case, supra, we said: "In all our decisions on this subject there can be discerned as a prerequisite to the taxation exemption of an institution claimed to be benevolent or charitable that it, or the portion of its property, in respect to which exemption is claimed, must possess an eleemosynary characteristic not possessed by institutions or property devoted to private gain or profit. What is 'given' must be more nearly gratuitous than for a price which impresses one as being proportionate to the services rendered. There must be facts which justify a finding that the 'actual use and occupation' of the premises is primarily for the designated charitable object and not largely for commercial purposes." We also said: "A judicial desire to be liberal toward institutions which are doing praiseworthy public work has sometimes led the courts to invest the word 'charity,' as used in the above excerpt from the Constitution, with a meaning not warranted either lexicologically or by a consideration of the ideology of the constitutional provision invoked. Webster's New International Dictionary, 2d edition, defines a 'charity' (in the institutional sense) as 'an organization or institution engaged in the free assistance of the poor, incapacitated, distressed, etc.' Under this definition the characteristics of an organized charity are: First, whatever it does for others is done free of charge, or at least

so nearly free of charge as to make the charges nominal or negligible; second, that those to whom it renders help or services are those who are unable to provide themselves with what the institution provides for them, that is, they are legitimate subjects of charity."

We find nothing in this record which indicates that The Ogontz School possesses any eleemosynary characteristic not possessed by other schools devoted to private gain or profit and whose charges are probably no greater than the charges made by this School. Nor do we find that it is an institution engaged (except to an almost inconsequential extent) in the "free assistance of the poor". With exceptions so negligible as not to be a controlling factor in our decision, what this School does for its students is not done free of charge or so nearly free of charge as to make those charges merely nominal. Certainly the students who pay $1,900 a year for the education and board and lodging they receive at this School cannot (and assuredly do not) regard themselves as objects of charity.

The Appellee attempts to distinguish this case from the *Germantown Y. M. C. A.* case, supra, by saying that "The Ogontz School is not commercial in character and is not operating in competition with any business. It is entirely charitable in nature and its entire property and facilities are used in the forwarding of its charitable purpose." We cannot accept any of these four assertions. While ordinarily we do not think of schools as "commercial in character", yet many schools are commercial and to class them as such is no reflection on their usefulness. Any institution which sells food and lodging and instruction for what those things are worth or for a little more than they are worth is engaged in a commercial enterprise. West Point Military Academy is not a commercial institution. Its students pay no fees. Public schools are not commercial; they charge no tuition fees. There are also many schools and col-

leges which were created by charitable gifts and are so richly endowed that the fees charged the students pay for only a small part of the instruction and training the students receive. Girard College is an institution of purely public charity; its students pay no fees. But there are hundreds of excellent schools and colleges in this country which derive a profit from the fees paid by the students they educate. These schools and colleges are not supported by the state or nation and they are not richly endowed, if endowed at all. Those who own or manage these institutions expect to show a financial surplus at the end of the fiscal year. Those which fail to make money and merely "break even" are still in no sense institutions of public charity any more than an hotel would be which at the end of the year showed no profits made, or even showed a loss. Even if these schools and colleges only make enough money to maintain the buildings and to pay the operating costs, including the salaries of the teachers, and reasonable compensation to the owner-manager of the institution, they are nevertheless not institutions of purely public charity.

The Ogontz School apparently made a profit from the date of its organization. It has paid off since 1928 a debt of $550,000. It is also pertinent to note that the president of the school received a salary from 1929 to 1936 (seven "depression years") of $20,000 a year, plus a home and her maintenance. This is obviously a very large salary for the head of a school of 200 students and a "grade school" of 100 students. Any individual who organizes a small school and charges its students sufficient fees to pay during a period of 15 years a $550,000 debt on its buildings and grounds (almost 80% of its now assessed value) and also sufficient to pay all the operating expenses and to pay himself or herself a salary of practically $25,000 a year for seven years cannot successfully contend that he or she is

operating an "institution of purely public charity" and maintaining it "by public or private charity".

The statement in the Appellee's brief that The Ogontz School is "not operating in competition with any business" is immaterial to the issue and if it is material, it is subject to challenge. The Ogontz School is certainly in competition with other schools charging similar fees for similar services. The third statement quoted, that "The Ogontz School is entirely charitable in nature." is clearly not in accord with the facts. The students who pay $1900 a year for board, lodging and tuition have no reason to feel that they are the beneficiaries of charity. Neither can we accept the statement that the school's "entire property and facilities are used in the forwarding of its charitable purpose". The School's purpose is not charitable; it is to provide an education and room and board for its students at a price sufficient to pay for those things and to create a reasonable surplus to take care of the depreciation of the buildings and to pay for desirable additions to the plant and its equipment. The fact that a corporation declares no dividends does not make it a charitable institution. If in 1928 Miss Sutherland had purchased a valuable building to be used as a school in which she was to be the only teacher, and if the fees she charged her students were sufficient to liquidate 80% of the purchase price of this building in 15 years, and to pay herself a salary of $20,000 a year for seven years, and $8,000 a year for the remainder of the depression period, and during the entire period to provide her with a home and maintenance, it could not be correctly said that she was operating a school for "purely public charity".

The Ogontz School has been such a financial success that it was able to invest from its earnings $32,000 in a summer camp in the White Mountains. The fact that the School owns and maintains such a camp in New Hampshire for its students, and the further fact that

both this School and the Camp are self-sustaining is additional proof that the School is not an institution of "purely public charity".

The decision of this court in the *Y. M. C. A. of Germantown v. Philadelphia* case, supra, is controlling here. There we denied the claim to a tax exemption made by a charitable institution, in respect to that portion of its real estate which it rented commercially to lodgers, even though the profits from the renting of the dormitories were used to enable the Association "to provide a comfortable, decent home . . . for men" allegedly "in need of moral, spiritual and physical guidance". We said: "Even the most praiseworthy institutions must expect to support the government by paying taxes when it engages in commercial activities no matter how it uses the net proceeds of such activities." In that case we quoted what this court said in *American Sunday School Union v. Phila. et al.,* 161 Pa. 307, 29 A. 26: "But if such institution sees fit to engage in trade for the purpose of increasing its revenue, or making any part of its business 'self-supporting,' the trade part of its business can be taxed, and ought to be." In that case the Sunday School Union "established and maintain . . . a bookstore for profit", which profit was "devoted to the primary object of the charity", which was the printing and circulation of moral and religious publications. We held that this fact did not "in any degree affect the character of the trading or commercial enterprise", and that the Society was not exempt from paying taxes on the portion of its property used for commercial purposes.

That The Ogontz School is engaged in a commercial enterprise, i.e., furnishing food, lodging and instruction to students who pay for what they get cannot be questioned. That it is in competition with schools which offer the same goods and services for similar fees cannot be questioned. That The Ogontz School is almost wholly

supported by the fees it receives from the vast majority of its students cannot be questioned. What the Supreme Court of New Jersey said in *State (Trustees of Y. M. C. A.) v. City of Paterson,* 61 N. J. L. 420, 39 A. 655, is applicable to the instant case: "It is impossible to hold that these buildings are in this sense used exclusively for charitable purposes. With slight exceptions, those who use them are not the recipients of charity, but [are] such as purchase the right to use them at a price deemed adequate."

In the maintenance and operation of The Ogontz School we do not find a single eleemosynary characteristic which is not possessed by similar schools admittedly devoted to private gain or profit. Therefore, in attempting to support its claim for exemption from taxation it fails to meet the determinative test this Court laid down for such cases in *Y. M. C. A. of Germantown v. Philadelphia,* supra.

The conclusion we have reached in this case is consistent with both reason and authority and is in accord with former decisions of this Court in similar cases.

In *Philadelphia v. Overseers of Public Schools,* 170 Pa. 257, 32 A. 1033, the facts are as follows: The City sought to enforce a lien for registered taxes against certain lots on the west side of Twelfth Street, south of Market. On these lots were two three-story brick buildings used for school purposes. The property was owned by an ancient corporation, which received grants from William Penn. The grants defined the object of them to be "the establishment and maintenance of a public school, wherein the children of the rich might be educated at reasonable rates, and the poor gratuitously; the school to be under the care and management of a board of overseers". The school was operated for about 170 years when in 1874 "it had run down to very few pupils". In 1874 the overseers made a contract with R. M. Jones as head master, which stipulated that the corporation

would furnish the buildings, furniture, school apparatus, fuel and repairs, while it should receive one-eighth of the gross receipts for tuition, including in the estimate the tuition fees of such poor children as were educated gratuitously, at the expense of the corporation; Professor Jones to receive seven-eights of all the receipts, and pay thereout the salaries of all subordinate teachers. It was further guaranteed that the Professor's compensation should not be less than $2,000 annually. The school's annual income from bequests and legacies was about $3,800 a year. Under the management of Professor Jones the school "enjoyed almost phenomenal prosperity". In 1891 there were 300 students, 15 of them paid nothing, and the others paid a total of $48,606.35. Master Jones' portion of the receipts for that year were $12,633.55, and the balance in favor of the overseers was $2,406.24.

Justice Dean, speaking for this Court, said: "The school was to be made to pay, and it did pay. But by the new method, was there any promotion of the charity element which was one of the two objects of the founder? When master Jones in 1874 first took charge there were 17 boys in the school; there are now 360; but the number of free scholars was, in some years, less than the original 17 . . . the income has increased about one thousand per cent, the free scholars not thirty per cent. Success has not been in the line of the charity, but in the building up of a live, efficient school for those able to pay. It seems to us this school is a business enterprise; that the benefit from its success is largely gathered from those whom the founder termed the 'rich,' and by the head master, Mr. Jones . . . this institution is not conducted solely for the benefit of the public, any more than is the street passenger railway conducted for the benefit of the public; those of the public who can pay can ride; here, those of the public who can pay tuition fees are benefited by an education, just as they might be benefited

in many other excellent private schools in Philadelphia, where exemption from taxation is not thought of. Nor is this institution without an element of private gain; we doubt, if there be anywhere else in the land, in a school of like grade, an educator in receipt of a salary equal to the one thousand dollars per month received in 1891 by master Jones, as his share of the profits in this enterprise—for this last is clearly what it is—notwithstanding this share is denominated salary in the argument, . . . This is a business project, wherein the returns from capital and professional acquirements depend on good fortune and good management, just as in other business ventures. Nor does the school relieve the state from taxation. Under authority from the state, the municipality of Philadelphia, by taxation, provides for the education of every child within its limits, and this burden is in no appreciable degree lightened by the establishment of private schools. The charity had its foundation when no such complete and beneficent system of education as that created by the commonwealth had an existence, or was dreamed of by William Penn. If such a system had been in operation in the small town on the Delaware, in 1708, or if at that time he had had reason to anticipate such an one would be adopted in the future, it is probable his benevolence would have taken some other direction. At this day, when the city raises by taxation and expends sufficient money to educate every child, rich and poor, the private school in no sensible degree relieves the public burden; if it be exempted from taxation, the public burden is increased by imposition of the exempted tax upon others who share not in the gain from the private enterprise." In that case this Court, reversing the court below, denied the claim to a tax exemption.

In *Harrisburg v. Trustees of Harrisburg Academy,* 308 Pa. 585, 162 A. 815, this Court held that the Harrisburg Academy was not an institution of purely public

charity and that it was liable for a municipal lien for paving. The Academy had received as a gift from the state the land upon which the school was originally built and appropriations amounting to $2,500. The location of the school had been changed several times, always with some profit to the institution in the sale of the old and purchase of the new site. The annual enrollment at the time of our decision was about 215. The students were admitted upon applications passed upon by the head master. The tuition fee had been increased in recent years, and charges for boarding students ranged from $650 to $1,060 per year, including tuition, room and board; day students paid from $320 to $440 per year. In the four years after 1925, $23,610.54 was awarded as scholarship aid to 155 boys. A number of the students paid their way through school by waiting on tables and doing other work. There was one student who paid nothing at all. In that case Mr. Justice DREW pointed out in his opinion that: "The officers and trustees of the corporation serve entirely without compensation, and its entire revenue, which is derived almost completely from the charges for tuition, etc., is devoted to the operation, maintenance and improvement of the academy. None of the teachers have any interest in the income of the school; they receive salaries comparable to those paid in other schools of the same type. The school has been very well managed, with the result that there has been, exclusive of sinking fund requirements of $7,000 a year, an annual surplus of income over expenses ranging from $4,000 to $17,000 in the last five years. This profit was devoted to paying off a mortgage debt incurred to finance the erection of new buildings, and for the increase of the facilities of the school." We said in that case that: "Only if defendant is a 'purely public charity,' can it successfully maintain its claim to exemption: [citing cases]. In this connection 'purely' must be construed in the popular sense . . . the word

means completely, entirely, unqualifiedly: Donohugh's App., 86 Pa. 306; White v. Smith, 189 Pa. 222."

It was also pointed out in that opinion that: "Admission to the academy is not a privilege open to all who may apply, within the capacity of the school, but is restricted to those whom the headmaster in his discretion sees fit to admit." Likewise, in the instant case we must assume that admission to this school is not a privilege open to all who may apply, as is, for example, the case of a public school, but is restricted to those whom the authorities see fit to admit and who can afford to pay $1,900 a year for the privilege of admission. However, we regard this feature of the case of much less importance than the fact that The Ogontz School, like the Harrisburg Academy, is *not* operated completely, entirely, and unqualifiedly as an institution of public charity. The appellee attempts to distinguish the *Harrisburg Academy* case from the instant case by reason of the fact that in the *Harrisburg Academy* case "the profits of the Academy could under its charter be privately distributed". Whether or not its profits *could* be so distributed is immaterial for, as we said in our opinion in that case: ". . . its entire revenue, which is derived almost completely from the charges for tuition, etc., is devoted to the operation, maintenance and improvement of the academy." In the *Harrisburg Academy* case the opinion concluded with this statement, which is equally applicable here: "There can be no doubt that the defendant academy is a school deserving of the highest commendation, wisely and unselfishly managed by its trustees, but it is equally clear that it is not an institution of purely public charity, and that its property is not exempt from taxation."

In *Thiel College v. The County of Mercer,* 101 Pa. 530, this Court said that an institution in order to be exempt from taxation must "be of a public character; not only must they be founded and endowed by public

or private charity, but they must be maintained in the same manner. But when we come to apply this constitutional and statutory definition to Thiel College it will not fit at all. From a legal standpoint it has not a single feature of a public charity about it. It is not even alleged that a solitary charity pupil is now within its walls, or that it is in contemplation that there ever shall be a pupil of that kind. What kind of a charity is that in which every one pays, either in money or work, for what he gets, whether it be food or education? And what is the object of these charges for boarding and tuition, if it be not to make this institution self-sustaining? If, however, that is its object, the intention is that it shall be supported, 'maintained', by revenues which it may derive from what it has to sell—education, and not by private or public charity."

In the case of *County of Northampton v. Lafayette College*, 128 Pa. 132, 18 A. 516, the Court found that only a small fraction of the annual costs were paid by tuition fees and deficits at the end of the year were made up by gifts, and that fully half of the total number of students were not required to pay tuition fees because of their inability to do so. The college has received its land, erected its buildings, provided its library and its scientific apparatus with money donated to the college and its permanent fund or endowment was furnished in the same manner. In sustaining the school's exemption from taxation this Court said: "it is clear that it was founded and endowed by charity. . . . it is substantially maintained by charity. That a small fraction of its annual cost may be paid by tuition fees, is not enough to deprive an institution, substantially maintained by charity, of the protection of the act of 1874."

The next four cases are cited in the appellee's brief, but an analysis of these cases reveals that the cases do not support the appellee's claim for exemption from taxation.

In the case of *Donohugh v. The Library Company of Philadelphia,* 86 Pa. 306, the exemption was allowed because the court found that the Library Company of Philadelphia permitted the use of its library; 1. By *all* persons within the library building, free of charge or fee of any kind; 2. By *all* persons who desired to take out books for a small hire and leave a deposit as security therefor; 3. By members who paid an annual fee for the privilege of taking out books. These members had the further privilege of voting for the managers, and were nominally the owners of the library. No dividends were paid, but the entire income was dedicated to the expenses and purchase of books. The distinction between that case and the instant case is obvious.

In *Mercersburg College v. Mercersburg Borough,* 53 Pa. Superior 388, exemption from taxation was allowed. The Superior Court found that the college "had its origin in a charitable foundation and its enlargement by the acquisition of more land and an increased number of buildings was made possible by contributions to promote the education of young men". The Court found further that the college's income "derived from the charge for the education, board, lodging and other care of the students in attendance, from land cultivated, from books, athletic supplies used by the students and from a small endowment fund for several years has exceeded the actual cost of maintenance leaving out of consideration the addition of buildings, . . . [yet] the income from administration would not be sufficient to carry on the school and pay rent for the buildings which shelter it. In an important sense, therefore, the charity is not self-supporting although its income from tuitions and other sources more than meet the cost of instruction, board, lodging, etc. Without the constant reinforcement of the former charitable donations the school could not be maintained at all." In the instant case almost 80 percent of the entire cost of the school's real

estate, i.e., the sum of $600,000, was represented by two mortgages which have been seven-eighths liquidated by profits derived from the operation of the school. Unlike the *Mercersburg College* case, The Ogontz School did *not* have its origin "in a charitable foundation" nor has the erection of its buildings been made possible by contributions. Even in the *Mercersburg College* case the Court held that that part of the college's real estate "used for agricultural purposes and for a truck garden" is not exempt from taxation. The Court added: "Such use of the property is convenient and perhaps profitable but in no sense a necessary or usual adjunct of an educational institution. The liability of property so used to taxation was decided in Sisters of the Blessed Sacrament, 38 Pa. Superior Ct. 640."

In *Haverford College v. Rhoads et al.,* 6 Pa. Superior Ct. 71, the Master found that the "college was founded by the voluntary contributions of people interested in the cause of education and desirous of promoting its objects. Since the time of the founding and during the history of the institution, large sums of money have been contributed from time to time for relieving the deficiency in its income. In the year 1840, one fund of $30,000 was contributed to pay off the debt of the corporation, and in 1845, owing to the pressure of financial difficulty, the college was closed and was not reopened until 1847, when an additional sum of $50,000 was contributed as a permanent endowment fund, whereby it was able to recommence operations. This fund has been increased by contributions and legacies to $100,000, and is constantly being drawn upon to meet the deficiencies in the ordinary income of the institution. In the year 1873, the sum of $18,000 was raised for the purpose of paying off accumulated deficiencies, and quite a number of smaller subscriptions have been made at different times for the same purpose. Barclay Hall, a building erected at a cost of $80,000 for the purpose of providing dormi-

tories and study rooms for the students in 1876, was built almost entirely by subscriptions, as the sum of $73,000 was donated for that purpose. During the three years prior to 1884, a subscription of $8,000 per year was made and paid by friends of the college for the purpose of increasing the efficiency of the college, to meet the deficiency in the income, and to reduce the debt of the institution; and in that year a sum of $50,000 was subscribed and nearly all of it paid as a further contribution to liquidate existing debt, caused by deficiencies in the income of the college, and prior to 1894, five friends agreed each to give $3,000 a year for five years, to apply, first, to all the scholarships that were necessary, and second, to apply to other current expenses." The Master also found that the loss in operating the College in 1892 was $12,000. The Superior Court, affirming the court below, said: "There can, therefore, be no doubt that the foundation and endowment have been by private charity." It also said: "The sources of maintenance are from unconditional gifts, from special gifts or legacies in trust for specific purposes, and from the fees paid by a part of the students. . . . The holders of scholarships, whole or partial, as found by the master, constitute, probably about one half of the whole attendance at the college." Since in that case the institution *with all its buildings* were paid for by charitable gifts, and since at *least half* of the students paid no fees whatever, and since the other half of the students paid much less than they would have been required to pay had not the college been created and endowed by charitable gifts, it is obvious that the decision in that case presents no precedent for sustaining the claim made in the instant case for exemption from taxation.

In *Episcopal Academy v. Philadelphia,* 150 Pa. 565, 25 A. 55, the facts were as follows: The Academy was incorporated by a number of persons of the Protestant Episcopal Churches of Philadelphia for the purpose of

affording encouragement to the education of youth. It was endowed with the funds necessary for the purchase of a lot and the erection of a school building thereon by its founders and friends, and by the State of Pennsylvania, which gave it ten thousand acres of public land. . . . It was maintained almost wholly by the fees for tuition charged to the pupils, who were divided into three classes; those who paid the full price fixed by the trustees for tuition, those who paid half price, and those who were admitted without charge. It was held that the school was exempt from taxation.

In *White et al. v. Smith*, 189 Pa. 222, 42 A. 125, Justice DEAN referred to the cases of the Episcopal Academy and the *Philadelphia v. Women's Christian Association*, 125 Pa. 572, and to *Philadelphia v. Penna. Hospital*, 154 Pa. 9, and said: "It is difficult to bring them on their facts within the rules of [Donohugh's Appeal, supra] . . . They can be sustained only by a very liberal construction of the act of 1874, and they go in the direction of exemption to the uttermost limit of such construction." He also said: "We have no desire to disturb the judgments in the three cases cited; they stand on the facts peculiar to them, and are outside the line of cases which follow Donohugh's Appeal. After this lapse of time and our observation of the litigation which has had its source in the act of 1874, and the constitution which suggested the act, we are averse to any departure from the law of that case [Donohugh's Appeal]; we therefore adhere to it now, as the settled rule of interpretation of that act. It is a safer guide than the Women's Christian Association case, which gives such prominence to the one fact, the absence of corporate or private gain. Carry that a little further, and it would exempt a carrying corporation from taxation, whose receipts are less than its expenditures; whose stockholders received no dividends, and yet the road is operated for the benefit of the whole public on exactly the same terms. We will

not open the road further in that direction, because both the constitution and the statute obstruct it; and it is immaterial whether the courts break through or go around this obstruction, the end is the same; the very thing which the constitution sought to cure as a legislative abuse will become a judicial one."

An example of a school which is clearly entitled to a tax exemption is found in the case of *The Barnes Foundation v. Keely et al.,* 108 Pa. Superior 203, 164 A. 117. The Foundation was and is a nonprofit corporation formed to promote the advancement of education and the advancement of the fine arts. Its students were admitted without regard to race, color or sex and no applicant for instruction was barred, except for drunkenness, incompetency, or necessary limitation in the number that could be accommodated. No tuition was charged, but, to the contrary, financial aid was given to worthy students. The Foundation represents an investment in pictures of upwards of five million dollars and has an endowment of approximately ten millions. It was held that the Foundation was a purely public charity and exempt from taxation. The distinction between that case and the instant case is obvious.

Our decision in this case appears to be in accord with the decisions of the highest tribunals of other states which have interpreted similar provisions in their statutes relating to the exemption of charitable institutions from taxation.

In *Dwight School v. State Board of Tax Appeals,* 114 N. J. L. 594, 177 A. 875, the facts were similar to the facts in the instant case. The institution seeking exemption was a school for girls. This school was for several years operating at a profit. It was then transferred to a "non-profit" corporation. However, the tuition fees remained the same. They ranged from $200 to $500 a year for day school and $1500 a year for tuition and lodging and board. The New Jersey Supreme Court

said, in denying the exemption: "Here the claimant operates what is essentially an exclusive boarding school. It is not local in character. It is held out as offering superior educational facilities and standards, and social advantages not obtainable in the common schools. . . . Its tuition fees are fixed accordingly. . . . The benefit to the community, viewed from the standpoint of the rendition of service that would otherwise be a governmental function and obligation, is merely a trivial incident."

In *Kimberley School v. Town of Montclair,* 137 N. J. L. 402, 60 A. 2d 313, the facts were that the school had been established in 1906 by two ladies and operated for many years as a private school. In 1941 a non-profit corporation was formed, and in 1943 the two owners sold all the properties used in the operation of the school to the new corporation for a consideration of $50,395. The purchase price was paid by assuming two existing mortgages amounting to $10,395; by paying $2,000 in cash to each of the grantors, and by giving each grantor a bond for $19,000, which bonds were secured by a purchase money mortgage. In 1943 the income from all sources amounted to $60,000, divided as follows: From tuition fees $56,000; from income from endowments $103; and from gifts $758. The total expenditures amounted to $57,533, leaving a surplus of $2,801. In denying exemption from taxation the court said: "Although there have been some scholarships granted, the sums charged patrons have been sufficient to cover the cost of operation and the project cannot be said to be one of a charitable nature."

In *Town of Montclair v. State Board of Equalization of Taxes,* 86 N. J. L. 497, 92 A. 270, the facts were that a school corporation had been run as a business enterprise, charging tuition fees on a private school basis for boarding and day pupils. Its sole source of income was the tuition fees. On April 30, 1912, just before the

time for the annual tax assessment a new corporation was organized under the "Act to incorporate associations not for pecuniary profit". The old corporation conveyed everything to the "association" subject to the existing mortgages; the association paying no cash but giving a purchase money mortgage for $100,000, which was immediately assigned to the owner of the former corporation. The school continued as before. Whatever profits the school made were applied to the mortgage given the owner of the former school. The Court after pointing out that a school not conducted for profit was exempt from taxation said that such a school "must necessarily be fundamentally philanthropic or charitable, and only incidentally the source of income for its staff". The Court also said: "There is nothing in this case to show either a deficiency of tuition fees, an endowment, or that the teachers are underpaid and serve as an act of charity or philanthropy. The school is, as it always has been, a business proposition, conducted to make an adequate living for its real owner." The Court then affirmed the imposition of the tax on the Academy. This opinion refers to the case of the *Montclair Military Academy v. Bowden,* 64 N. J. Law, 214, 47 A. 490, in which the Academy was held to be taxed on its property, though exempt from state tax on its capital stock.

In *The Brunswick School v. Town and Borough of Greenwich,* 88 Conn. 241, 90 A. 801, it was held that a school for boys from 6 to 18 years of age, which was attended by about 100 pupils, and paying an annual tuition of from $150 to $350 per year, was not exempt from taxes under the Connecticut Statute which exempts institutions used for public purposes. The Court there said: "The investment of capital in the corporation is not an endowment of the capital invested, or of the building in which it is invested, to the public use. Nor does the fact that no dividends have yet been paid, as

found by the court, affect the situation. . . . It has been the policy of the state . . . to leave untaxed . . . all property, public or private, which has been sequestered or devoted to public uses." [1]

---

[1] The case of the Dufur Hospital, No. 15, June Term, 1943, C. P. Montg. Co., was before the same Common Pleas Court which decided the instant case. There on December 21, 1945, exemption from taxation was denied. The Dufur Hospital was started in 1922 and for 20 years was owned and operated by Mrs. Dufur and her husband. After her husband died she transferred the title to the property to a non-profit corporation, named Dufur Hospital. The transfer included the entire 53-acre tract upon which the hospital was located, subject to the payment of an existing first mortgage of $30,000, and a second mortgage of $110,000 executed by the corporation to Mrs. Dufur and payable in 12 years. She retained the privilege of naming three of the five members of the Board of Directors of the corporation until the second mortgage of $110,000 should be paid. About a year later Mrs. Dufur became the superintendent of the hospital at a salary of $6,000 a year. Twelve months later this was increased to $15,000 a year. She was also paid a total of $17,760 on her second mortgage. She contended that the hospital operated as a charity and that it extended charity to certain patients. This charity consisted of reducing the charges for room and maintenance where certain patients were not able to pay the full amount.

Judge CORSON of the Montgomery County Court said: "The hospital contends that where the prices charged to patients were less than the actual cost of the services rendered, such difference should be classed as charity by the hospital. Even this contention might be questioned. Certainly every business man who sells his goods below cost cannot be classed as giving charity to the public." He added: "We cannot say that this hospital was founded by public or private charity. It was originally founded by the Dufurs as a business enterprise and the corporation merely took title thereto. Admittedly the hospital has no endowment since the corporation merely took the paper title to the hospital covered by mortgages to the extent of the total purchase price. . . . This hospital is maintained and operated solely from the charges to patients treated therein for the services rendered to them. The amount charged and received by the hospital has been substantially in excess of the costs of such services including carrying charges, reduction of mortgages, etc. This excess has been referred to as 'surplus' by the corporation."

A claimant for exemption must bring himself clearly within the exempting statute. *Dougherty v. Philadelphia,* 314 Pa. 298, 302, 171 A. 583. Any act which would attempt to exempt from taxation any institution other than one of purely public charity would be unconstitutional. Justice DEAN said, in *White v. Smith,* 189 Pa. 222, 42 A. 125: "One thing was clear at the start, no matter what was the legislative language, the exemption could not extend to any property not a 'purely public charity'." [2]

---

Judge CORSON attempts to distinguish that case from this case by saying: "In the Dufur case, Mrs. Dufur, while transferring the legal title to a non-profit corporation, retained control over the Board of Trustees so that she was in a position to have the entire property returned to her at any time that she saw fit, and actually did return the hospital property to her absolute ownership and control after the court refused the tax exemption. No such situation exists in the present case." This distinction is not a valid one. What a person *can* do with a certain property in the future has no bearing on the question: Is the property *now being used purely for purposes of public charity?* It is a property's present use and not its possible future use which either supports or negatives the claim made for its exemption from taxation. Even a lot on which a church is to be built, or is being constructed, is not exempt from taxation. Exemption attaches only when the building is complete and is actually in use as a place of religious worship. *Baptist Church v. City of Pittsburgh,* 88 P. L. J. 477.

The Dufur Hospital was not founded and endowed and is not now maintained by public or private charity. Neither was The Ogontz School so founded and so endowed, and it is not now so maintained.

[2] An example of the strict construction of the Constitution and statutes in passing on claims for exemption is found not only where the claim is made that an institution is one of "purely public charity" but also where an attempt is made to bring under the exemption, "All churches, meeting-houses or other regular places of stated worship, with the ground thereto annexed necessary for the occupancy and enjoyment of the same." Act of May 21, 1943, P. L. 571, Art. II, § 202, 72 PS 1946, Cumulative Annual Pocket Part § 5453-202. This Act was passed pursuant to Section 1 of Article IX of the Constitution, which provides that: "The General Assembly may, by general laws, exempt from taxation . . . actual places of religious worship. . . ."

In its argument Appellee stresses the fact that the School was chartered "as a non-profit corporation" and that "no one received directly or indirectly any profit

In the case of *Wynnefield Pres. Ch. v. City of Philadelphia et al.*, 348 Pa. 252, 35 A. 2d 276, the facts were that the southern portion of the land belonging to the church and containing the manse and a driveway was assessed for taxes. The church and a strip 15 feet wide adjoining the church on its northern side were exempt. The remaining 50 feet of vacant ground was assessed for the taxes in dispute. The court below held that: "The lot sought to be taxed is reasonably necessary for the occupancy and enjoyment of the church building." This Court in reversing the court below said: "Our examination of the evidence on the 'sole issue' . . . requires us to conclude that it does not support the finding that the lot is reasonably necessary as a 'means of ingress and egress for the congregation and to permit the church structure as built, to have sufficient light and air,' . . ."

In *Mullen v. Commissioners of Erie County*, 85 Pa. 288, Chief Justice AGNEW said: "It is the use, not the building, which defines the exemption. But the use which is made of a place is a present fact, not something ideal or in contemplation merely. If religious or public worship have not been held in the place, indeed, statedly held in it, the place itself has not a character. At some day, distant or near, it may be intended to be used for stated public worship, but the fact that it is not now used strips it of its only title to exemption. This cathedral, a misnomer, indeed, for it is only an unfinished structure, intended to become a cathedral, has been in the course of construction several years, and when it will be finished and used for religious worship we know not. The great cathedral on Eighteenth street, in the city of Philadelphia, was many years in progress before it was finished—probably twenty. A building intended for a church may never be finished, or its use may be changed. On what principle, under the new constitution, should the property be exempted from taxation before it can be used, when it is the use only which gives it a title to exemption?"

In *First Baptist Church of Pittsburgh v. Pittsburgh*, 341 Pa. 568, 20 A. 209, the facts were that the church purchased a lot adjacent to its church building for the purpose of providing the location for a parish house and an addition to the portion of the church used as a Sunday school, such buildings to be erected when funds were available. At the time the question arose as to whether the land was exempt from taxation the lot was used for parking purposes for the use of those attending the church. The court below found that this

from the school". These facts do not clothe the School with exemption from taxation. Those who establish and conduct an institution may declare that in doing so they do not intend to make a profit from anyone and they may conduct it without pecuniary profit to anyone, and yet it may not be "an institution of purely public charity". In determining an institution's status in this respect it must be viewed from the standpoint of the public. Can the public look upon Ogontz School as an institution where each year three hundred students or the vast majority of them can obtain lodging, food and instruction for nothing (as, for example, 1800 orphan boys do at Girard College), or for a charge so far below the value of the things they get that what they get are charitable gifts? The answer is, "No". The vast majority of those three hundred students who attend The Ogontz School pay not only for all they get, but they pay for more than they get, at least to an extent sufficient to enable the School to provide what is equivalent to free board, lodging and instruction to about 10% of its students. It was chiefly from fees paid by students over a considerable period of time that $550,000 of the indebtedness against the School was liquidated. If an indi-

---

use of the lot was not a necessity to the church and was not exempt from taxation. On appeal this Court said: "The word 'necessary' does not import an absolute necessity, but its meaning cannot be broadened so as to comprehend that which is merely desirable. . . . The meaning is limited to a reasonable necessity and contemplates among other matters the inclusion of sufficient ground for entrance and exit and for light and air. . . . The lot later purchased and for which an exemption is now claimed is a large lot located at the rear of the church and at a point where there is the least need for light, air and approach. If such a lot in its entirety is exempt, little limitation will be placed on the amount of land that may be taken over by a church, thereby casting an additional burden on other taxpayers." Exemption was denied.

See *Sisters of the Blessed Sacrament*, 38 Pa. Superior Ct. 640, and Cooley, "Taxation", Volume 2, Fourth Edition, Sections 745, 746.

vidual should establish a boarding and lodging house and declare that he did not intend to make a profit from it, but that he did intend to maintain a schedule of rates which would enable him to pay all his operating expenses and to provide himself with a very substantial salary, and also to give free lodging and board to 10% of his patrons and to reduce annually by $10,000 to $15,000 the debt encumbering his property he could not successfully maintain that he was conducting an institution of purely public charity.

In passing on claims for exemption from taxation no court has the right to ignore the plain mandates of the organic law and of the statutes enacted in conformity therewith. In the *Germantown Y. M. C. A. v. Philadelphia,* supra, we said: "Taxes are not penalties but are contributions which all inhabitants are expected to make (and may be compelled to make) for the support of the manifold activities of government. Every inhabitant and every parcel of property receives governmental protection. Such protection costs money. When any inhabitant fails to contribute his share of the costs of this protection, some other inhabitant must contribute more than his fair share of that cost."

Since the above was written nearly thirteen years ago the cost of all local, state and national governments has increased in unprecedented measure. Every wage earner and every property owner feels the burden of taxation growing constantly heavier. Millions of American income producers are now forced to pay each year in the form of direct and indirect taxes nearly half of their income for the support of national, state and local governments. The heavier the burden of taxation becomes the more exigent is the demand for its equitable distribution. All those whose persons and property receive the protection of government should bear their just share of its cost unless the law specifically exempts them from doing so. To exempt any institution from

paying for the protection it receives means that other property owners, already taxed for their own and their property's protection, must also pay for the protection given that exempted institution and its property.

The Constitution of Pennsylvania and statutes enacted in conformity therewith have exempted the property of certain institutions from taxation because those institutions render a necessary and useful public service; in many instances the service they provide is one which but for them the government itself would have to provide. This is particularly true of institutions which provide free education to youth and of cemetery companies which are not organized for purposes of private profit. All these (in addition to actual places of religious worship and two other classes of property) are institutions "of purely public charity". The Ogontz School is not such an institution.

The decree of the court below is reversed. Each litigant will pay its own costs.