Robert Morris College *v.* Board of Property Assessment, Appeals and Review, and Moon Area School District, Intervenor.

Argued February 24, 1972, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Alan L. Ackerman,* with him *Frank J. Pohl, Michael R. Stabile, Jr.,* and *Berkman, Ruslander, Pohl, Lieber & Engel,* for appellant.

*Sheldon L. Keyser,* Assistant Allegheny County Solicitor, with him *Francis A. Barry,* Allegheny County Solicitor, *Ralph Lynch,* Pittsburgh City Solicitor, and *Grace Harris,* Assistant Pittsburgh City Solicitor, for appellee.

*Bresci R. P. Leonard,* with him *Royston, Robb, Leonard, Edgecombe, Miller & Shorall,* for intervenor.

OPINION BY JUDGE KRAMER, June 9, 1972:

This is an appeal from an Order and Opinion of the Court of Common Pleas of Allegheny County dismissing the appeals of Robert Morris College, appellant (Robert Morris) from two adverse decisions of the Board of Property Assessment, Appeals and Review of Allegheny County, appellee (Board). The Board denied the grant of appellant's requests for real estate tax exemption on property located in the second ward of the City of Pittsburgh (No. 819 C.D. 1971) and in Moon Township (No. 820 C.D. 1971). The desired exemptions affect tax liability commencing with the tax-

able year 1968 and extend to the years thereafter. The appeals involving the realty at these two locations were consolidated for argument and disposition by both this Court and the lower court.

Robert Morris contends that owing to its non-profit corporate nature and its ongoing operation as an institution of higher learning (a college) entirely free from any private profit motive, in that no individual has any direct pecuniary interest in the revenues of the institution, it is entitled thereby to the constitutionally created, and legislatively implemented, real estate tax exemption granted to institutions of "purely public charity."

The record discloses that prior to 1962 the institution was a family-owned proprietary school. On March 20, 1962, it qualified as a Pennsylvania non-profit corporation operating under the name of "The Robert Morris School." On September 25, 1962, its Charter was amended for the purpose of changing its name to "Robert Morris Junior College" and empowering the college to grant associate degrees. On May 22, 1969, by virtue of additional amendments to the Charter and Articles, it became "Robert Morris College" empowered to grant degrees on the baccalaureate level. Pursuant to its 1969 Charter, it was authorized to operate as a college under the laws of the Commonwealth.

The statutes provide that a college must be a non-profit corporation and that it must further establish and maintain a protective endowment in the amount of $500,000 beyond all indebtedness and amounts invested in real and personal property. (Regulation 900, Department of Public Instruction, Bureau of Academic Standards and Services, and Non-Profit Corporation Law, Act of May 5, 1933, P. L. 289, 15 P.S. 7312) Robert Morris presently operates as an institution of higher learning duly certified by the Department of Public

Instruction of the Commonwealth. Accreditation by the Middle States Association of Colleges and Secondary Schools was achieved in 1968.

To facilitate a determination of the issues presented, it is necessary to have at hand a clear and concise picture of the fiscal history of the appellant college. The opinion of the court below sets forth an accurate narrative of those facts and we therefore adopt them and set them forth as follows:

"Prior to the incorporation of the appellant as a non-profit corporation, the Robert Morris School, a Pennsylvania corporation, along with three closely held associated corporations, conducted a proprietary school with J. R. McCartan, Sr., as its President and with other members of the McCartan family holding interests either in the Robert Morris School or in the closely held associated corporations known as the Beverly Cafeteria Company, The School Furniture, Inc., and R.M.S. Book Store. In 1962 the McCartans sold all of their stock in the aforementioned four corporations to the College, selling the school as a going business and it was this business which the College, upon its incorporation, continued to operate as 'The Robert Morris School.' The McCartans received $400,000.00 for their stock in the aforementioned four corporations, which corporations had no real estate holdings. In addition, the appellant assumed all of the liabilities of the McCartan corporations which approximated $385,000.00. A lease arrangement was also entered into between the appellant and Beverly Realty Company, a corporation whose stock was also owned by members of the McCartan family. Under this lease arrangement, the appellant rented the downtown center (Pittsburgh property) for approximately two years, during which time it paid a rental to the owner, Beverly Realty Company, of approximately $460,000.00, including utilities and taxes.

Subsequently, the appellant bought the stock in Beverly Realty Company, for which it paid the McCartans $239,000.00 and assumed corporate liabilities approximating $1,016,000.00. These obligations included a note payable to J. R. McCartan, Sr., in the amount of $38.-000.00. J. R. McCartan, Sr., who had served as President of the proprietary Robert Morris School continued to serve as President of the successor-appellant from its incorporation until 1967. He also acted as Board Chairman until 1968. J. R. McCartan, Jr., also served on the Board from 1962 until 1968 and during the period of 1962-1963, he received $21,600.00 per year in salary. During his service with the College, J. R. McCartan, Jr., served as Financial Officer and for a time was a Vice President of the College. Beginning January 1, 1964, the appellants paid $6,000.00 per month to the J. R. McCartan Company under a management agreement. This arrangement continued until October 1, 1966. The College also purchased its Moon Township property from a third party in 1962 for a consideration of $650,000.00 and assumed an existing mortgage of $43,326.00. The consideration for the real estate and stock acquisitions by the College was obtained entirely through conventional financing, most of which was in the form of mortgages as well as from interest and non-interest bearing loans. No portion of the real estate or other assets purchased by the College were acquired through charitable contributions, either public or private. Furthermore, the College's entire indebtedness has been and is being retired out of its revenues, rather than from charitable contributions.

"The appellant's Pittsburgh facilities consist of an eight-story building with a three-story addition, housing classrooms, cafeteria, library, student services area, counsel rooms and administration offices. Its Moon Township facilities are located on a 230-acre tract of

land upon which are erected 17 buildings, including dormitories, classrooms, student union facilities, etc. The enrollment at the College has grown from a student body of approximately 1,000-1,200 students at the time of its incorporation in 1962 to a 1970 enrollment of some 4,300 students. Present tuition for a full-time student is $1,200.00 per year and those students who are provided with room and board pay an additional $950.00.[1]

"In the fiscal year 1969-1970 the College awarded scholarships amounting to $559,314.00, but approximately ½ million dollars of this came from Federal and State grants earmarked specifically and solely for scholarship use. Only $50,000.00 to $60,000.00 in scholarship aid was appropriated by the College in its budget.

"During the fiscal year 1967-1968, the College had a gross income of almost $4,000,000.00 and after deduction of interest payments and operating expenses, it showed a net income of $931,778.00. Out of this it paid $338,000.00 on its long-term debt, placed $128,000.00 into a sinking fund and reserves and paid $200,000.00 on a demand note leaving income of $266,000.00 for other uses. The foregoing figures, although approximate, substantially reflect the sound financial condition of the College.

"Of its gross income of approximately $5,000,000.00 in 1969-1970, slightly less than $60,000.00 was budgeted by the College for scholarship use which sum was included in gross revenues with an expenditure in the same amount. The remaining scholarships granted by the College were in large part from grants earmarked specifically for scholarships by Federal and State grants with very little from private contributions.

---

[1] A $2,150.00 cost, exclusive of books and supplies, is less than other non-state related colleges in the area.

"The excess of revenues over expenditures by the College in 1969-1970 was approximately $860,000.00. The large proportion of the College's income is from its student tuition, which in the last fiscal year, in and of itself appears to have exceeded the operating expenses. The College has a $500,000.00 cash endowment created almost entirely (except for $21,133.00) from its excess revenues. The endowment was authorized in late 1968 and was completely funded by March, 1969. It apparently was authorized in an attempt to comply with Section 312($A_1$) of the Pennsylvania Non Profit Corporation Law (15 P.S. 7312$A_1$) just prior to the time the College amended its Charter in 1969 to provide for operation an [sic] a four-year college, authorized to award degrees."

Article VIII, Section 2 of the Pennsylvania Constitution states:

"(a) The General Assembly *may* by law exempt from taxation:

"(v) *Institutions of purely public charity*, but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purposes of the institution." (Emphasis added.) Obviously then, this section is not self-executing and does not grant per se any tax exemptions. Legislation is required to create an exemption from real estate taxes.

The General Assembly by the enactment of The General County Assessment Law, Act of May 22, 1933, P. L. 853, Article II, Section 204, as amended, 72 P.S. 5020-204 established the kinds of property which may be exempted and, *inter alia,* provided:

"The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit:

"(c) All hospitals, universities, colleges, seminaries, academies, associations and institutions of learning,

benevolence, or charity, including fire and rescue stations, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, *founded, endowed, and maintained by public or private charity*: Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose; (Emphasis added.)

"(i) All real property owned by one or more institutions of *purely public charity,* used and occupied partly by such owner or owners and partly by other institutions of purely public charity, and necessary for the occupancy and enjoyment of such institutions so using it; . . ." (Emphasis added.)

We must begin with an understanding of the underlying philosophy of the constitutional-legislative grant of tax exemption. "Taxes are not penalties but are contributions which all inhabitants are expected to make (and may be compelled to make) for the support of the manifold activities of government. Every inhabitant and every parcel of property receives governmental protection. Such protection costs money. When an inhabitant fails to contribute his share of the costs of this protection, some other inhabitant must contribute more than his fair share of that cost. . . . Any institution which by its charitable activities relieves the government of part of this burden is conferring a pecuniary benefit upon the body politic, and in receiving exemption from taxation it is merely being given a 'quid pro quo' for its services in providing something which otherwise the government would have to provide. . . . The measure of an institution's gratuitous aid to those requiring it is the measure by which the government is relieved of its responsibilities." *YMCA of Germantown v. Phladelphia,* 323 Pa. 401, 413-14, 187 A. 204, 210

(1936).[2] Thus while Robert Morris may well relieve the government of part of its burden to provide for higher education, the constitutional legislative philosophy of tax-exemption is only applicable to charitable institutions. We must also be cognizant of that body of case law holding that statutory provisions exempting property such as charitable institutions from taxation are subject to a strict construction rather than a liberal one. *See YMCA v. Reading,* 402 Pa. 592, 167 A. 2d 469 (1961); *McGuire v. Pittsburgh School District,* 359 Pa. 602, 60 A. 2d 44 (1948); and *see* Statutory Construction Act, Act of May 28, 1937, P. L. 1019, Article IV, Section 58, 46 P.S. 558(5). Since liability of all real estate to taxation is the rule, with exemption the exception (*see Dougherty v. City of Philadelphia,* 112 Pa. Superior Ct. 570, 172 A. 177 (1934)), the burden is placed upon the taxpayer to bring himself within the exemption statute. (*See Pittsburgh Institute of Aeronautics Tax Exemption Case,* 435 Pa. 618, 258 A. 2d 850 (1969); *University of Pittsburgh Tax Exemption Case,* 407 Pa. 416, 180 A. 2d 760 (1962); *Wynnefield United Presbyterian Church v. City of Philadelphia,* 348 Pa. 252, 35 A. 2d 276 (1944); *Albright College Tax Assessment Case,* 213 Pa. Superior Ct. 478, 249 A. 2d 833 (1968).

In the case of *Woods Schools Tax Exemption Case,* 406 Pa. 579, 584, 178 A. 2d 600, 602 (1962), the Court stated: "For the appellant to obtain the claimed exemption from taxation, it must affirmatively show that the entire institution, (1) is one of 'purely public charity'; (2) was founded by public or private charity; (3) is maintained by public or private charity." *See Four*

---

[2] We recognize, of course, that the "quid pro quo" theory is not the sole determinative test to be employed in a real estate tax-exemption case. (*See West Indies Mission Appeal,* 387 Pa. 534, 128 A. 2d 773 (1957).

*Freedoms House of Philadelphia v. Philadelphia,* 443 Pa. 215, 279 A. 2d 155 (1971). The question whether the real property owner is an institution of "purely public charity" within the meaning of the Constitution and the statutes is a mixed question of fact and law. *See Hill School Tax Exemption Case,* 370 Pa. 21, 87 A. 2d 259 (1952), and *Presbyterian Homes Tax Exemption Case,* 428 Pa. 145, 236 A. 2d 776 (1968). Insofar as the question of what is charitable is one of mixed fact and law, the courts of this Commonwealth have been troubled in arriving at any concise definition of the term. The majority of the cases cited in this Opinion are replete with portions thereof devoted to a review of precedent dealing with what is and what is not a "purely public charity."

In the case of *Ogontz School Tax Exemption Case,* 361 Pa. 284, 65 A. 2d 150 (1949), the court held that an educational institution whose income from tuition payments is sufficient to cover all of its operating expenses and its debt service (with or without a resultant surplus) cannot constitute an institution of "purely public charity."

In *Ogontz, supra,* the court considered as critical, the percentage of students receiving scholarship aid and the ratio of tuition received and scholarship aid granted. The facts therein indicated that the value of the free scholarships approximated an amount equal to about ten percent of the total tuition and fees paid by the students. The court concluded that the devotion of ten percent to scholarship aid was of insufficient amount to permit the institution's inclusion within the category of a "purely public charity." In this case Robert Morris enjoyed a net profit in excess of a quarter of a million dollars. The record is silent on what Robert Morris did or planned to do with that profit. Robert Morris allocated a little more than one percent

of its revenue for the purpose of partial scholarships despite an operating surplus in excess of a quarter of million dollars. The *Ogontz* court at page 294 cited *Germantown YMCA, supra,* in which the court said at page 409: "In all our decisions on this subject there can be discerned as a prerequisite to the taxation exemption of an institution claiming to be benevolent or charitable that it, or the portion of its property, in respect to which exemption is claimed, must possess an *eleemosynary characteristic* not possessed by institutions or property devoted to private gain or profit. What is 'given' must be more nearly gratuitous than for a price which impresses one as being proportionate to the services rendered." (Emphasis added.) *Black's Law Dictionary* (4th Ed.) (1957) defines "eleemosynary" as "Relating to the distribution of alms, bounty, or charity; charitable." In view of the fact that about eighty-five percent of the entire revenues of Robert Morris each year come from the tuitions paid by students and less than two percent of its revenues are devoted towards partial scholarships for day students only (no full scholarships are given by Robert Morris), this college can hardly be said to be of an eleemosynary nature.

It is true that in the case of *Hill School Tax Exemption Case, supra,* at page 26, the court stated: "The word 'purely' as used in the Constitution in the phrase 'purely public charity' means that the institution must be entirely free from private profit motive. . . ." And at page 27: "A purely public charity does not cease to be such where it receives some payment for its services." The facts of that case indicate the receipt of substantial gifts at the very founding of the institution and the receipt of considerable gifts thereafter. Furthermore, forty-nine percent of the student body was receiving aid from the Hill School, causing the institution to be

brought within the term "purely public charity." The court in *Woods Schools Tax Exemption Case, supra,* relying on its earlier holdings held that to qualify as a "purely public charity" the institution "must donate or render gratutiously a substantial portion of its educational services." In *Episcopal Academy v. Philadelphia,* 150 Pa. 565, 25 A. 55 (1892), a case wherein the tuition charged was less than charged in comparable institutions and where eight percent of the students paid one-half the regular tuition and nine percent paid no tuition at all, the court held that where the excess income realized by the institution was used to aid as great a number of students as possible, particularly the large number unable to pay their own way, this qualified the school for the exemption. In *Woods School Tax Exemption Case, supra,* the majority of students were those able to pay for the services rendered and no students attended free of all charges and the holding of the Supreme Court denied the desired tax exemption. In the case of *Presbyterian Homes Tax Exemption Case, supra,* wherein the Court upheld an exemption for a labor union sponsored home for the aged, where most of the residents paid for their care and expenses incurred, the holding of the court was that a purely public charity did not cease to be such where it receives some payment for its services. But the court itself restricted that case to a situation where the payment by the resident was the *sole* question on whether or not the institution was a purely public charity. In this case the payment by the students to Robert Morris is not the only question involved.

We see little merit in the argument of the taxing authorities in this case that Robert Morris could not be tax exempt because it was not "founded" as a purely public charity. It is not difficult to conceive of many factual situations wherein a profit making institution

could be transformed into a purely public charity by some turn of events. The mere fact that Robert Morris College was not the object of someone's benevolence at the time of its inception in 1962 must not be allowed to not prevent its qualification at a later date as a "purely public charity."

We are likewise unimpressed with the argument that inasmuch as the one-half million dollar endowment created by the college contains only $21,000.00 attributable to charitable contribution, the college has not been endowed by public or private charity. The fact that most of its original endowment came from its own earnings is not determinative of that question. The record clearly shows that a statute of this Commonwealth requires the half-million dollar figure. In the absence of the statutory requirement of one-half million dollars, Robert Morris could have created an endowment employing only the $21,000.00 resulting from charitable contributions, thereby satisfying the requirement of being endowed by public or private charity. Most educational institutions of higher learning by necessity devote many years to the development of their institutional endowments. The existence of a statute requiring substantial "instant" endowment should not preclude an institution from qualifying for exemption. We are, however, concerned with the qualification of the college under the third element of the statutory requirement, i.e., that it be "maintained" by public or private charity.

The record in this case clearly shows that no person receives any pecuniary benefit from the revenues of Robert Morris College. Its Board of Trustees serves without remuneration. Its employes, professional and nonprofessional, are paid salaries, wages and expenses comparable with those of other institutions. There is likewise no question whatsoever that Robert Morris

College performs a great public service to many young people of the community and of the state and country. Its accreditation by the Middle States Association attests to its satisfactory high caliber. The area in this record most troublesome to us revolves around facts indicating that Robert Morris College retained surplus income or profit of $265,709.00 for the fiscal year 1967-68 (the test year apparently used in this case) over and above all of its expenses and yet provides less than $60,000.00 in partial scholarships limited to day students. Night students receive no scholarship aid. The rather minimal amount of funds expended for scholarship grants makes it impossible for us to permit the exemption of the college realty from real estate taxation. The amount of the scholarship aid, and the extent of it, in comparison with the other operating financial statistics of the institution, must be considered when determining whether Robert Morris is an institution of "purely public charity." (*Pittsburgh Institute of Aeronautics Tax Exemption Case, supra*). Our holding should in no way be interpreted to mean that the question of the college's future qualification as a "purely public charity" is absolutely foreclosed; such interpretation would be fallacious. We do, however, hold under the present circumstances as indicated by the record, the college has failed to bring itself within the constitutional and legislative requirements of the real estate tax exemption.

The stance assumed by the college, in effect, urges upon us the interpretation that if it performs a purely public function, or, if it is operated for a "charitable educational purpose," or, if it performs "charitable services," or if it has "charitable motives" yielding up no private gain to any individual, it should then qualify for exemption eligibility as a "purely public charity." As sympathetic as we may be with that position, our

law does not support or permit it. The *possibility* that perhaps the surplus or profit earned by Robert Morris could be used for charitable purposes or in its educational institution for the benefit of the students does not aid us for as was said, in *YMCA of Germantown, supra,* at page 412: "The fact that all the net proceeds of a business are used for charitable purposes does not make that business a charitable institution."

We would be remiss if we did not cite the case of *Vanguard School Tax Exemption Case,* 430 Pa. 378, 243 A. 2d 323 (1968), wherein our Supreme Court allowed the exemption to a non-profit school for handicapped children. The school's operating costs were met by student tuition ($3,000 per year), by a state subsidy ($1,500 per student per year), and by the generosity of individual contributors. The school allocated only 2.2 percent of its operating revenues to scholarship aid; and it realized a surplus of $80,000 during the test period. From our reading of the several cases cited in this Opinion we must concede that *Vanguard, supra,* sticks out like the proverbial "sore thumb." The Court in *Vanguard, supra,* appears to have ignored its own line of precedent, and in succeeding cases, the Court has chosen each time to distinguish *Vanguard, supra,* on its facts.

We hasten to point out, however, that we distinguish *Vanguard, supra,* from this case for two reasons. First, the *Vanguard* opinion states: "Generous benefactors contributed toward founding and *maintaining* the Vanguard School, but their gifts cannot equal the sums required to operate such an institution to the end that parents may eventually see their child, the healthy, social, companionable person they had envisioned before his or her birth." (Emphasis added.) 430 Pa. 378, 243 A. 2d at 323. The Pennsylvania Supreme Court, based upon the record of that case, held that the Vanguard School was, in fact, maintained as a purely public char-

ity. The record in this case does not support such a maintenance. Secondly, the Vanguard School provided an educational service to young citizens who could not receive an education in the usual manner. These handicapped students were in need of specialized assistance. The Commonwealth recognized this fact as indicated through its subsidization of a portion of the educational costs of these handicapped persons.

*Vanguard, supra,* can be distinguished further by the fact that the record clearly indicated that any financial surplusage was being applied directly to the costs of educating the handicapped students. The Supreme Court in the case of *Pittsburgh Institute of Aeronautics Tax Exemption Case, supra,* recognized this point as a salient feature of the *Vanguard Case, supra,* when it stated: "In a recent case which involved the application of this same statute to the Vanguard School, we noted, as an important factor in allowing the exemption, that any profits realized were used directly for the cost of the school rather than going to any individuals. See: Vanguard School Taxation Case. . . ." 435 Pa. at 626, 258 A. 2d at 854. In this case there is nothing in the record which discloses what Robert Morris did or intends to do with the surplus money realized from its operations. We have no way of knowing, for example, whether that surplusage was to be paid to individuals as bonuses, or increased salaries, or whether it was to be used for the direct benefit of needy students.

In spite of the fact that we would have no trouble classifying Robert Morris as a public charity, we are troubled by the additional constitutional requirement found in the word "purely." "Purely" to us means it must be entirely or wholly a public charity in every sense of the word, which would include all of the elements found in the word "eleemosynary." Based upon the above analysis of the law and applying the facts of this case to that law, we must affirm the court below.