Point Park Junior College (now Point Park College), Appellant v. Board of Property Assessment, Appeals and Review of Allegheny County and City of Pittsburgh, Appellees. (Two Cases)

Argued October 27, 1975, before President Judge Bow-
MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON,
JR., MENCER, ROGERS and BLATT.

*Richard B. Tucker, Jr.,* with him *William J. Staley,
John P. Papuga,* and *Tucker, Arensberg & Ferguson,* for
appellant.

*John G. Arch,* Assistant County Solicitor, with him
*Stephan A. Zappala,* County Solicitor, for appellee, Board.

*Bernice Hummert,* with her *Joseph A. Fricker, Jr.,*
Assistant City Solicitor, and *Mead J. Mulvihill, Jr.,* City
Solicitor, for appellee, City of Pittsburgh.

OPINION BY JUDGE KRAMER, February 18, 1976:

This is an appeal by Point Park Junior College (now Point Park College) from an order of the Court of Common Pleas of Allegheny County dated November 30, 1973, dismissing the appeals of Point Park from decisions of the Board of Property Assessment, Appeals and Review of Allegheny County. The Board had denied Point Park's application for tax-exempt status for two parcels of realty located in the City of Pittsburgh. The tax period to which these appeals are limited is the 1963-65 triennium, and the two appeals were consolidated for trial and for appeal to this Court. The issue presented to us is whether Point Park qualifies for tax-exempt status as a purely public charity. We hold that it does.

In 1933, Dr. Dorothy C. Finkelhor founded a private, proprietary school known as Business Training College (BTC). BTC was operated by Dr. Finkelhor and her husband, L. Herbert Finkelhor, at a number of different locations in the City of Pittsburgh, and provided training primarily in secretarial and other related business skills. As a result of the loss of a lease in 1956, the Finkelhors negotiated to purchase an eight-story hardware and warehouse building known as the Woodwell Building. They, together with their three daughters, formed the Carjonon Land Company which purchased that building for $151,-000. After extensive renovation which cost $484,480.21, the Finkelhors used the building for the operation of BTC and other educational ventures, through a lease arrangement with Carjonon. The building was also partially renovated at a cost of $175,000 by the Y.W.C.A., a tenant. This amount was credited against the Y.W.C.A.'s rent payments to Carjonon. The purchase included a lot 70 feet by 34 feet adjoining the property.

By the late 1950s the curriculum of BTC had developed to a point where it was, for practical purposes, a liberal arts college, although it was unable to grant baccalaureate degrees and the credits awarded to its stu-

dents were not transferable to other colleges and universities. In response to the needs of her students, Dr. Finkelhor decided to reorganize BTC as a junior college, which would permit the granting of associate degrees and the possible transfer of credits. The Finkelhors and their daughters made application for a nonprofit corporation charter and on November 21, 1960, the charter was granted after approval by the Pennsylvania Council on Education. The approval was granted on the conditions that four of the seven directors would not be related to the Finkelhors and that Point Park would purchase Carjonon's title to the Woodwell Building for a price based upon the fair rental value for ten years or the appraised value, whichever was lower.

On February 1, 1961, Carjonon sold the Woodwell Building property to Point Park for $840,000 under a ten-year installment sale agreement which carried no interest payments. The college paid $7,000 per month. Title vested in the college after a two-year period at which time final payment was made crediting the monthly payments made. Under the agreement of sale, Carjonon paid the taxes, insurance premiums and mortgage payments during the two years prior to the vesting of title. At the same time BTC entered into an installment contract with the college for the sale of its furniture and equipment for $70,000 payable over a six-year period in monthly installments of $1,166.66. This agreement also provided for no interest charge. At the time Point Park commenced operation on February 1, 1961, it had vested interests in a building, furniture and equipment under these two transactions. It had also acquired, in addition to these physical assets, a going business together with its administrative staff, faculty, student enrollment and good will without any additional payments. Except for its commitment for the land, furniture and equipment, Point Park did not incur any indebtedness to the Finkelhors, Carjonon, or BTC, nor did it assume any of their

debts. Later Point Park received an exempt organization certification from the United States Internal Revenue Service upon the condition that the corporate charter be amended to provide that upon dissolution the assets of Point Park "shall be distributed for educational purposes, or for one or more of the other purposes specified in Section 501(c)(3) of the Internal Revenue Code." The corporate charter was so amended.

On July 25, 1962, Point Park purchased from Carjonon the adjoining lot mentioned above (included in Carjonon's initial purchase of the Woodwell Building), together with another lot for the total price of $75,000. The second college building involved in this case (Thayer Hall) was built by Point Park on these two lots. The second lot was purchased by Carjonon for $35,500 and had the same dimensions as the vacant lot originally purchased with the Woodwell Building. Carjonon's selling price for these two lots was $75,000, or double the price Carjonon paid for one-half of the vacant land.

After the passage of some time, Point Park received its accreditation from the Middle States Association, and since that time the credits of students have been readily transferable to other institutions of higher learning. Additionally, the Board of Directors was increased in size to nine, six of which must be persons not related to the Finkelhors. For the period in question both of the Finkelhors received salaries up to $17,500 per year for services rendered to Point Park, and their son-in-law served as secretary of Point Park. All of the salaries paid were within reasonable levels when compared with the salaries paid to officials and employes of comparable institutions.

The trial court ruled that only evidence pertaining to the taxable years 1963 through 1965 was relevant, and because Point Park operated on a fiscal year ending June 30th, statistics for the school years 1962-63 through 1965-66 were received. Using data for that period of

time (generally taken from the trial court's opinion), we set forth the following pertinent statistics:[1]

It is fair to say that this record discloses no personal financial interest by any of the Finkelhors or any of the directors in any of the operations of Point Park since its inception except for those who received a salary commensurate with their services.

The trial court concluded that Point Park was not a "purely public charity" and, therefore, not entitled to exempt-tax status because (1) the dollars of aid to students when compared with the total revenues did not reach the percentage which the trial court perceived to be necessary under *Ogontz School Tax Exemption Case,* 361 Pa. 284, 65 A.2d 150 (1949) ; (2) the Finkelhors had, through BTC, sold the physical assets of BTC to Point Park at a profit; and (3) the court could find no characteristic of Point Park or its curriculum which would classify it as an "eleemosynary institution," as described in this Court's opinion in *Robert Morris College v. Board of Property Assessment, Appeals and Review,* 5 Pa. Commonwealth Ct. 648, 291 A.2d 567 (1972). It is interesting to observe that the facts of this case are strikingly

---

1. Point Park offered into evidence a statistical exhibit which indicates that for the six-year period 1966-67 through 1971-72, in five of those years Point Park lost substantial sums of money and at the end of the period 1961-62 through 1971-72, it had a cumulative loss of $1,357,037. Because of the court's ruling on restricting evidence to the triennium, this additional information was not received and, therefore, will not be used by this Court in this opinion.

| Fiscal Year | Students | Total Revenue | Net Income (Loss) | Student Aid | Gifts Received |
|---|---|---|---|---|---|
| 1962-63 | 892 | $1,162,086 | ($159,140) | $ 3,007 | $ 1,000 |
| 1963-64 | 1,126 | 1,475,638 | 86,845 | 14,050 | 13,500 |
| 1964-65 | 1,455 | 1,703,496 | (64,011) | 55,993 | 32,000 |
| 1965-66 | 1,683 | 2,124,232 | 186,176 | 98,108 | 3,400 |
| | | $6,465,452 | $ 49,870 | $171,158 | $49,900 |

similar to those in *Robert Morris,* but in important ways they are also distinguishable.

Since Point Park claims exemption as a purely public charity this appeal is governed by Article VIII, Section 2 of the Pennsylvania Constitution of 1968 which permits the General Assembly by law to exempt from taxation:

> "Institutions of *purely public charity,* but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purposes of the institution." (Emphasis added.)

This provision was implemented by the General Assembly by the Act of May 22, 1933, P.L. 853, *as amended,* 72 P. S. §5020-204, which establishes the kind of property which may be exempted and, *inter alia,* provides:

> "The following properties shall be exempt from all county, city . . . and school tax, to wit:
>
> "(c) All hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence, or charity . . . with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, *founded, endowed, and maintained by public or private charity;* Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose. . . ." (Emphasis added.)

We must be cognizant of that body of case law holding that statutory provisions exempting properties such as charitable institutions from taxation are subject to a strict construction. *See YMCA v. Reading,* 402 Pa. 592, 167 A.2d 469 (1961) ; *McGuire v. Pittsburgh School District,* 359 Pa. 602, 60 A.2d 44 (1948). Since liability of all real estate to taxation is the rule, with exemption the exception, the burden is placed upon the taxpayer to bring himself within the exemption statute. *See Pitts-*

*burgh Institute of Aeronautics Tax Exemption Case,* 435 Pa. 618, 250 A.2d 850 (1969); *University of Pittsburgh Tax Exemption Case,* 407 Pa. 416, 180 A.2d 760 (1962). As we noted in *Robert Morris, supra,* our Supreme Court in *Woods Schools Tax Exemption Case,* 406 Pa. 579, 584, 178 A.2d 600, 602 (1962) stated:

> "For the appellant to obtain the claimed exemption from taxation, it must affirmatively show that the entire institution, (1) is one of 'purely public charity'; (2) was founded by public or private charity; (3) is maintained by public or private charity."

Without reiterating everything we said in *Robert Morris,* all of which we reaffirm in this case, it is fair to summarize that the party requesting tax exemption as a purely public charity must bear the burden of proving (1) that there is some significant charitable support for the school; (2) that the school has rendered significant charitable services to the public by way of scholarship aid to students; and (3) that the school's income was expended for its educational purpose without the accumulation of unappropriated surpluses. The word "purely" means that the school is entirely or wholly a public charity in every sense of the word, which would include all the elements found in the word "eleemosynary."

All of the parties to this appeal have expended an inordinate and unnecessary amount of time arguing about the financial arrangements for the sale of the Woodwell Building. Our review of the trial court's opinion permits us to conclude that this particular transaction was not one of the bases upon which the court denied Point Park's application. As a result, we need only say in passing that we likewise conclude that there was nothing improper about that transaction which would preclude Point Park from an exempt status.

The parties seem preoccupied with past history and statistics, as though there is some stereotype set of circumstances which automatically precludes or estab-

lishes tax exemption. From our reading of the cases our Supreme Court directs us to evaluate all of the facts in determining whether the applicant qualifies for tax exemption. For instance, if it is shown that the persons who organized a nonprofit educational institution realized an unconscionable profit, continued control after the reorganization, received a financial benefit through the operation of the institution, required the students to provide all or almost all of the funds necessary to meet all of the institution's expenses (including the cost of student aid to needy students) and created a surplus of net income not appropriated for the charitable purposes of the institution, obviously, such an institution should not be granted a tax exemption. That is not the case here.

This record establishes that Point Park was at least partially founded in charity in that it paid only a reasonable amount for the property it received, both realty and personalty, and the founders received nothing for the value of the "going concern." The property was paid for over a number of years, without any interest on the balance due. Certainly if an educational institution purchases property, furniture and equipment in its operation, the payment for which is extended over a period of time, in the ordinary course of business, it would be forced to pay interest on its mortgage and deferred payments on personalty. These interest payments would have to be included in the operational costs of the institution and revenues would have to be raised to pay such interest charges through tuition and fees. In this case those interest payments would have been substantial, and to that extent Point Park was founded and maintained as a charity. The record in this case clearly shows that no person received any pecuniary benefit from the revenues of Point Park. Its Board of Trustees serves without remuneration. Its officers and employes are paid salaries, wages and expenses comparable with those of other institutions. There is no question that Point Park performs

a great public service to many young people in the community. Its accreditation by the Middle States Association attests to its satisfactory high calibre. As we pointed out in *Robert Morris, supra*:

"It is not difficult to conceive of many factual situations wherein a profit making institution could be transformed into a purely public charity by some turn of events. The mere fact that Robert Morris College was not the object of someone's benevolence at the time of its inception in 1962 must not be allowed to not prevent its qualification at a later date as a 'purely public charity.' " 5 Pa. Commonwealth Ct. at 659-60, 291 A.2d at 574.

As the trial court correctly observed, the only question is whether Point Park qualifies for tax exemption for the triennium at issue.

The opinion of the trial court mentions with specificity only one defect in the operation of Point Park which it believed precluded the school from tax exemption, *i.e.*, the percentage of total income used for student aid. Relying on *Ogontz, supra,* the trial court pointed out that Point Park granted student aid amounting only to 4.61% of the total revenue during 1965-66, which was the year of its highest percentage of student aid. We believe the trial court fell into error because it failed to give consideration to other circumstances which have a direct bearing on (1) the determination of the amount of aid which was actually given, and (2) the amount of aid which could have been given during the triennium. The record shows that during the years 1962-1965 Point Park offered a tuition-free high school dropout program to thousands of students, at an average annual cost of $55,000. During the last half of the program (the program was phased out after the end of the triennium) salaries were paid to the teachers and Point Park received a grant of $10,000 from the Mellon Foundation. These students were in need of specialized assistance as were

the students who were the basis for our Supreme Court's decision in *Vanguard School Tax Exemption Case*, 430 Pa. 378, 243 A.2d 124, (1968). *See also Robert Morris, supra.* Point Park also participated in a program known as the Student Loan Fund, and during the period in question it *contributed* approximately $9,000 because part of the loans became outright grants in aid to those students who became teachers. If we consider the expenditures Point Park made for these programs, the percentage of revenues used to aid needy students increases to about 9%. All of the aid programs of schools such as Point Park should be taken into consideration in evaluating how much of the school's revenue is used for student aid.

In addition, as long as there is no evidence indicating that the school has improperly used its revenues (and this was not shown in this case) we believe the Court must also include in its evaluation gifts or donations and net income. Certainly if gifts or donations are received and used to assist students, this factor supports a conclusion that an institution is a charity. During the period in question, Point Park received $49,900 in gifts. Referring to the statistical chart set forth above, Point Park had a net surplus during two years and net losses during the other two years, resulting in a net surplus for the four pertinent years of $49,870.

Since there is nothing in the record to indicate that this net income was a result of some improper financial or statistical arrangement, we must determine whether this surplus should have been used for some charitable purpose. The statistical chart set forth above permits us to conclude that Point Park could not have significantly increased its student aid during the period without additional borrowing which, in turn, would have worked to the disadvantage of its charitable purpose. We also note that if Point Park had been forced to pay interest on its purchase of realty and personalty in 1961, the net income of $49,870 would have been completely wiped out. This

point, it seems to us, proves that the courts cannot design a rigid formula for these cases. We cannot evaluate whether an applicant qualifies for tax-exempt status without looking at all of the facts. It is obvious that Point Park has increased its student aid each year and its income has not increased with any regularity.

The City and County taxing authorities rely heavily upon *Robert Morris, Supra.* In *Robert Morris* the founders of the school sold their stock (representing the proprietary school's value as a going concern) to the nonprofit corporation for $400,000, plus the assumption of $385,000 of existing debt. In the instant case the value of the going concern was *given* to Point Park. Point Park assumed no debt of Carjonon, BTC or the Finkelhors. In *Robert Morris* the founders sold the stock of their landholding company to the college for $239,000 and the assumption of corporate liabilities in the amount of $1,016,000, including notes and mortgages with interest ranging from 6% to 9%. In this case, Carjonon sold the Woodwell Building for $840,000 on an interest-free installment land purchase agreement over a ten-year period. There was no assumption of the mortgage and there was no interest paid by Point Park. In *Robert Morris* the founders' management company was paid $72,000 for three years. Point Park had no such contract. In *Robert Morris* the college accumulated substantial unallocated surpluses from its operations, but Point Park has not had two successive years in which it accumulated a surplus. In *Robert Morris,* the college allocated about 1% of its revenues for student aid whereas, in this case, depending upon how one views the statistics, student aid ranged from three to nine percent. Point Park has granted as much student aid as it reasonably could from its net profit and none of the students' tuitions and fees have been used for the personal benefit of the founders except for salaries and the reasonable purchase price of realty and personalty.

In summary we conclude that Point Park was founded, endowed and maintained as a public charity and that the record supports its characterization as an "eleemosynary institution." It is, therefore, entitled to tax-exempt status for realty tax purposes.

The order of the Court of Common Pleas of Allegheny County is reversed.